**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| VERDESSA MCDOUGALD, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil No. ELH-17-2898 |
| DETECTIVE MICHAEL SPINNATO, *et al.*, | * | |
| Defendants | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This case arises from the tragic death of 38-year-old Tyree Woodson ("Mr. Woodson" or

the "Decedent"), while at the Southwestern District Police Station of the Baltimore City Police

Department ("BPD"). The Decedent's mother, plaintiff Verdessa McDougald, has filed an

Amended Complaint, individually and as Personal Representative of the Estate of Mr. Woodson,

asserting a variety of claims against Detective Michael Spinnato, Sergeant Sterling Price,

Detective Earl Thompson, Detective "Mathew" Pow, Detective "Mathew" Dzambo,[1] Detective

Kevin Carvell, Detective Jeffrey Converse (the "Officer Defendants"), and former BPD

Commissioner Anthony W. Batts, individually and in their official capacities. ECF 22.[2]

---

[1] According to the defense submission, defendants Pow and Dzambo spell their first names as "Matthew," not "Mathew." The Clerk shall be directed to correct the docket.

[2] Suit was initially filed in the Circuit Court for Baltimore City (ECF 2), but was removed to this Court on the basis of federal question jurisdiction, under 28 U.S.C. § 1331. ECF 1. The Officer Defendants subsequently moved to dismiss (ECF 16), which plaintiff opposed (ECF 18), supported by a memorandum (ECF 18-1) and several exhibits. The Officer Defendants replied. ECF 19. In lieu of dismissal, I granted plaintiff's request to amend the suit. ECF 20; ECF 21.

Plaintiff has structured her Amended Complaint into two "Cases," each with multiple counts *Id.* Case 1 presents wrongful death claims on behalf of plaintiff, in her individual capacity, and Case 2 presents survival claims on behalf of plaintiff as Personal Representative of Mr. Woodson's Estate.[3]  In Case 1, plaintiff asserts two counts.  Count I contains a claim for Wrongful Death for Gross Negligence lodged against the Officer Defendants.  Case I, Count II asserts a "*Monell* Claim,"[4] under 42 U.S.C. § 1983, for "wrongful death for negligent supervision, training, retention and custom or policy of deliberate indifference," lodged against Batts as well as the Officer Defendants.  In Case 2, plaintiff, as Personal Representative of the Decedent's Estate, asserts three counts.  Count I is a Survival Action for Gross Negligence, lodged against the Officer Defendants under Md. Code, § 7-401 of the Estates and Trusts Article ("E.T."), and Maryland Code, § 6-401 of the Courts and Judicial Proceedings Article ("C.J.").  Count II asserts a *Monell* claim, under 42 U.S.C. § 1983, against Batts and the Officer Defendants.  Count III contains a

---

[3] The Amended Complaint is inconsistent as to how it describes the capacity in which plaintiff seeks relief for each count.  *Compare* ECF 22, ¶ 58 (asserting a wrongful death claim "Individually and as Personal Representative of the Estate of Tyree Woodson"), *with* the *ad damnum* clause for the same count, asserting the claim only "as Personal Representative of the Estate of Tyree Woodson." *Id.* at 18.  The wrongful death claim is only cognizable in plaintiff's individual capacity, because a wrongful death claim benefits the survivors of a decedent, not the decedent's estate.  *Jones v. Prince George's Cnty.*, 541 F. Supp. 2d 761, 764 (D. Md. 2008).  Therefore, to the extent that Case 1 asserts wrongful death claims in plaintiff's capacity as the Personal Representative of Mr. Woodson's Estate, it will be dismissed,

The Amended Complaint is also inconsistent as to how it describes which defendants are named in each count.  *Compare* ECF 22, ¶¶ 59, 61 and the *ad damnum* clause for the same count, suggesting that the wrongful death claim is asserted only as to the Officer Defendants, *with* ¶¶ 58, 60, asserting the same claim against both the Officer Defendants and Batts.

[4] *See Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978).

Survival Action for funeral expenses, pursuant to E.T. § 7-401, apparently lodged against all defendants.[5]

The Officer Defendants have moved to dismiss the Amended Complaint under Rule 12(b)(6), for failure to state a claim (ECF 25), supported by a memorandum of law. ECF 25-1 (collectively, "Officer Defendants' Motion). Curiously, plaintiff failed to file an opposition to the Officer Defendants' Motion. However, I will consider plaintiff's opposition (ECF 18) to the Officer Defendants' earlier motion to dismiss (ECF 16) as the opposition to the second motion to dismiss. And, I shall also consider the Officer Defendants' earlier reply. ECF 19. Defendant Batts filed a separate motion to dismiss the Amended Complaint (ECF 31), also for failure to state a claim, along with a memorandum of law. ECF 31-1 (collectively, the "Batts Motion"). Plaintiff opposes the Batts Motion (ECF 35) supported by a memorandum (ECF 35-1) (collectively, "Batts Opposition") and an exhibit. Batts has replied. ECF 36 ("Batts Reply").

No hearing is necessary to resolve the pending motions. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, I will grant the Batts Motion, and I will grant in part and deny in part the Officer Defendants' Motion.

## I.      Factual and Procedural Background[6]

---

[5] The Amended Complaint seems to assert the *Monell* claims against the Officer Defendants, in addition to Batts. *See* ECF 22, Case I-Count II; Case 2-Count II. However, those defendants are not named consistently throughout the counts in question. In any event, as discussed, *infra*, *Monell* claims are directed at municipal corporations, and are not cognizable against individual defendants who have no alleged policymaking or supervisory roles. *See Monell*, 436 U.S. at 701.

[6] As discussed, *infra*, in the posture of this case, I must assume the truth of the facts alleged by plaintiff.

Mr. Woodson was shot in his left foot on July 25, 2014. ECF 22, ¶¶ 3, 10. On August 5, 2014, at about 10:45 a.m., Sergeant Sterling Price and Detective Earl Thompson, members of the BPD Warrant Apprehension Task Force, encountered Mr. Woodson and his mother as they exited their home in Baltimore. ECF 22, ¶¶ 3, 7, 8. They told Mr. Woodson that he was needed for questioning, and to provide a victim/witness statement regarding the recent incident in which Mr. Woodson was the victim of a shooting. *Id.* ¶¶ 8-10.

Plaintiff asserts that the officers' claim that they needed to obtain a statement from Mr. Woodson was a ruse, because an arrest warrant had been issued for Mr. Woodson in connection with the shooting of Jerome McDougald. ECF 22, ¶ 3.[7] In any event, Mr. Woodson and Ms. McDougald asked about the length of time of the interview, *id.* ¶ 11, and the officers "promised" that Mr. Woodson would be returned home "safely" in just "a few hours . . . ." *Id.* ¶ 12. At that point, the officers handcuffed Mr. Woodson, without searching him for weapons, and placed him in the back of the police cruiser. *Id.* ¶¶ 13-15. The failure to search under such circumstances violated BPD General Order J-13, which mandated "a thorough search of all arrestees . . . ." *Id.* ¶ 15.

The "unmarked" police vehicle arrived at the Southwestern District Police Station at about 11:05 a.m. *Id.* ¶ 17. Mr. Woodson was removed from the vehicle, still handcuffed, and entered the police station. *Id.* ¶¶ 18, 19. Again, he was not searched, as required by General Order J-13. *Id.* ¶ 19.

---

[7] According to an exhibit submitted by plaintiff (ECF 18-4), on August 4, 2014, Mr. Woodson was charged with the shooting of Jerome McDougald on or about July 30, 2014. However, as Batts observes, ECF 31-1 at 3 n.5, it is not clear from the Amended Complaint whether Mr. Woodson was arrested pursuant to a warrant or, instead, voluntarily consented to go with the detectives to provide a statement. *See* ECF 22, ¶¶ 3, 9-14, 64.

Mr. Woodson was placed into a prisoner holding cell in a secure area of the station. *Id.* ¶ 21. Detective Kevin Carvell handcuffed Mr. Woodson's right hand to a cement wall. *Id.* ¶¶ 20, 21. While in the holding cell, Mr. Woodson was in the presence of other inmates and police employees. *Id.* ¶ 23.

At about 12:15 p.m., Detective Matthew Dzambo advised Mr. Woodson that he should use the private bathroom outside the holding cell. *Id.* ¶¶ 25-26. Detective Dzambo then escorted Mr. Woodson into the private bathroom, without a search. *Id.* ¶¶ 26-28. At approximately 2:40 p.m., Mr. Woodson again asked to use the bathroom. *Id.* ¶ 29. Detectives Pow and Converse removed Mr. Woodson's handcuffs and allowed him first to smoke a cigarette "out back," using a cigarette and lighter that Mr. Woodson removed from his front pants pocket. *Id.* ¶¶ 30-31. Despite the officers' awareness that Mr. Woodson had the cigarette and the lighter, which are contraband for a detainee, they still did not search Mr. Woodson. *Id.*

After the bathroom and cigarette break, Detectives Pow and Converse escorted Mr. Woodson to a secure area for questioning, without searching him. *Id.* ¶ 32. They questioned Mr. Woodson about items recovered during the execution of a search warrant at Mr. Woodson's home approximately one hour earlier. *Id.* ¶ 33. They also interrogated Mr. Woodson about activities of the Black Guerrilla Family ("BGF") gang, and acknowledged that Mr. Woodson's "possible testimony against a purported BGF member will put his life in jeopardy . . . ." *Id.* According to plaintiff, the officers "threatened Mr. Woodson's life and safety with the reality that BGF gang members will retaliate against him for purportedly snitching." *Id.* ¶ 3.

The interrogation "visibly change[d]" Mr. Woodson's "demeanor and temperament from 'very respectful' to extreme fear for his safety, extreme fear of the BGF, extreme fear for the immediate safety of his family, crying and fear of going away for a long time." *Id.* ¶ 34. Mr.

Woodson acknowledged that he was a BGF member, and he asked the officers about relocating his family to protect them from BGF. *Id.* ¶ 35. The officers allowed Mr. Woodson to make a phone call to his girlfriend, during which Detectives Pow and Converse heard Mr. Woodson crying and telling her, "'the police found the gun and he was going to jail, that he would be gone for a long time.'" *Id.* ¶ 36.

After Mr. Woodson called his girlfriend, he again asked to use the private bathroom. *Id.* ¶ 37. Detective Pow escorted Mr. Woodson to the private bathroom, uncuffed and without searching him, and allowed him to enter the private stall. *Id.* ¶¶ 38-39. While in the bathroom (*id.* ¶ 39), Detective Pow heard a "'pop.'" *Id.* ¶ 40. When Pow opened the bathroom stall, he saw Mr. Woodson, "slumped back on the left side of the stall." *Id.*

Officer D. Mattingly entered the bathroom and saw Detective "Hollinsworth,"[8] who was "standing at the stall." *Id.* ¶ 42. He observed that Mr. Woodson had a single gunshot wound to his head. Mattingly also saw a single shell casing at the right side of Mr. Woodson's feet. *Id.* ¶ 43. Mr. Woodson was "alleged to have been seated on the toilet with his arms at his sides." *Id.*

In addition, Mattingly saw a single gunshot hole in the ceiling bathroom, above the Decedent. *Id.* ¶ 44. And, Mattingly observed a Glock 23 behind a trash can, "where Detective Hollinsworth stated he had placed hit [sic]." *Id.* ¶ 46; *see also id.* ¶ 45. The medics who responded determined that Mr. Woodson had a pulse. *Id.* ¶ 47. But, "moments later," upon removing Mr. Woodson from his seated position on the toilet to begin treatment, they pronounced him dead. *Id.* ¶ 48; *see also id.* ¶ 47. An autopsy and police investigation classified the manner of death as

---

[8] Plaintiff submitted a BPD report as to the incident, dated July 13, 2015. ECF 18-5. There, the surname is spelled "Hollingsworth." *Id.* at 6.

suicide.  *Id.* ¶ 51.  Postmortem toxicologic testing was negative for alcohol and positive for tramadol and morphine.  *Id.*

## II.     Legal Standards

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may test the legal sufficiency of a complaint by way of a motion to dismiss. *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  *See In re Birmingham*, 846 F.3d at 92.

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. at 1974; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' ...."); *see also Paradise Wire & Cable Defined Benefit Pension Fund Plan v. Weil*, ___ F.3d ___, 2019 WL 1105179, at *3 (4th Cir. March 11, 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff

need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2). *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 574 U.S. ___, 135 S.Ct. 346 (2014) (per curiam). But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief. *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013). If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient. *Twombly*, 550 U.S. at 555. "[A]n unadorned, the – defendant – unlawfully – harmed – me accusation" does not state a plausible claim for relief. *Iqbal*, 556 U.S. at 678. Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if ... [the] actual proof of those facts is improbable and ... recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted); *see Semenova v. Maryland Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides

whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts generally do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.*, 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan*, 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst*, 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies ... if all facts necessary to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

Ordinarily, in evaluating the sufficiency of a complaint in connection with a Rule 12(b)(6) motion, a court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein . . . ." *Clatterbuck v. City of Charlottesville,* 708 F.3d 549, 557 (4th Cir. 2013); *see Bosiger v. U.S. Airways, Inc.,* 510 F.3d 442, 450 (2007). "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated

into the complaint.'" *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448). Under limited circumstances, however, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for summary judgment. *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

In particular, a court may consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166; *see also* Fed. R. Civ. P. 10(c); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Paradise Wire & Cable*, *supra*, 2019 WL 1105179, at *4. However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)).

A court may also "consider a document submitted by the movant that was not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Goines*, 822 F.3d at 166 (citations omitted); *see Six v. Generations Federal Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citation omitted); *Kensington Volunteer Fire Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999). To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives

rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) (citation omitted) (emphasis in original).  *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

Plaintiffs appended several exhibits to their Opposition to the Police Officer's prior motion to dismiss.  *See* ECF 18.  They do not appear integral to the Amended Complaint, however, nor are they incorporated in the suit.  Therefore, I may not consider them in regard to the merits of the motions.

A court "may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see* Fed. R. Evid. 201(b) (stating that a "court may judicially notice a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.*, 6367 F.3d 462, 466 (4th Cir.), *cert. denied*, 565 U.S. 825, (2011); *Philips v. Pitt County Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). Accordingly, "[i]t is not uncommon for courts to take judicial notice of factual information found on the world wide web." *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007); *cf. Jeandron v. Bd. of Regents of Univ. Sys. of Maryland*, 510 F. App'x 223, 227 (4th Cir. 2013) (noting that the court may take judicial notice of information on a website, "so long as the web site's authenticity is not in dispute"). However, "these facts [must be] construed in the light most favorable" to the nonmovant. *Clatterbuck*, 708 F.3d at 557.

In resolving the motions, I have taken judicial notice of the fact that Batts was sworn into office on November 8, 2012. *See* Justin Fenton, "Batts formally sworn in as Baltimore police

commissioner," *The Baltimore Sun* (Nov. 8, 2012), http://articles.baltimoresun.com/ 2012–11–08/news/bs–md–ci–batts–sworn–in–20121108_1_anthony–w–batts–violentcrime–mayor–stephanie–rawlings–blake.

Before discussing the defense motions, it is also helpful to review the parameters of 42 U.S.C. § 1983.

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983; *see, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *City of Monterey v. Del Monte Dunes at Monterey, Ltd*., 526 U.S. 687, 707 (1999); *Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, ___ U.S. ___, 135 S. Ct. 1893 (2015). However, § 1983 "'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017). Therefore, "[t]he first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

To state a claim under § 1983, "a plaintiff must aver that a person acting under color of state law deprived him of a constitutional right or a right conferred by a law of the United States." *Wahi v. Charleston Area Medical Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *see Filarsky*, 566 U.S. 382-83; *West v. Atkins*, 487 U.S. 42, 48 (1988); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997). The phrase "under color of state law" is an element that "is synonymous with

the more familiar state-action requirement—and the analysis for each is identical." *Philips*, *supra*, 572 F.3d at 180 (citing *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982)).

A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The Fourth Circuit has said: "[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient." *Philips*, 572 F.3d at 181 (citations and internal quotation marks omitted).

Section 1983 also requires a showing of personal fault based upon a defendant's own conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to deprive the plaintiff of his rights). Thus, there is no respondeat superior liability under § 1983. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

Liability of a supervisory official under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege:

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to . . . the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994); *see also Wilcox*, 877 F.3d at 170.

In the "Jurisdiction" Section of the Amended Complaint (¶¶ 1-3 at 3-6), plaintiff asserts that the Police Officers "made an unreasonable seizure" of Mr. Woodson, "thereby violating his rights under the Fourth and Fourteenth Amendments to the United States Constitution . . . ." *Id.* ¶ 3 at 5. Other than a few cursory references to the Fourth and Fourteenth Amendments (ECF 22, ¶¶ 1, 3), there are no other references to any constitutional provisions. Plaintiff has not articulated, in the *Monell* counts, the alleged constitutional violations.

## III. The Batts Motion

Plaintiff has lodged the following claims against Batts. Case I, Count II: a wrongful death action, brought by plaintiff in her individual capacity, pursuant to 42 U.S.C. § 1983 and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978), alleging negligent supervision, training, retention, as well as a custom or policy of deliberate indifference. *See* ECF 22, ¶¶ 72-80; Case 2, Count II: a survival action, brought by plaintiff as Personal Representative of the Decedent's estate, pursuant to *Monell* and § 1983, and asserting the same alleged conduct. *Id.* ¶¶ 89-100.

Although not entirely clear from the Amended Complaint, plaintiff also appears to assert claims against Batts in his personal capacity for supervisory liability under § 1983, as well as in his official capacity, for the policies and customs of the BPD. ECF 22, ¶¶ 66–67, 70, 72-80.

According to plaintiff, the violation of the Decedent's rights occurred because, *inter alia*, Batts breached a duty "to implement General Orders regarding the mandatory search of all arrestees coming into and moving throughout the various police precincts in Baltimore City." *Id.* ¶ 74; *see also id.* ¶ 76. Moreover, plaintiff claims that Batts failed to train, supervise, and discharge the defendant Police Officers "for their failure to [conduct] proper searches . . . ." *Id.* at ¶ 75.

Plaintiff asserts § 1983 claims against Batts based on three theories of liability. First, plaintiff theorizes that the BPD—through Batts, in his official capacity as Commissioner— implemented a policy or custom of condonation or deliberate indifference. ECF 22, ¶¶ 75, 77. Second, plaintiff asserts that the BPD—through Batts, in his official capacity as Commissioner— had a custom or policy of failing to train its officers adequately. *Id.* And, the third theory is that Batts is liable in his personal capacity for failing adequately to supervise the BPD officers, including as to those involved in the incident with Mr. Woodson. *Id.* ¶ 77.

According to plaintiff, the Officer Defendants "made an unreasonable seizure" of Mr. Woodson, in violation his rights under the Fourth and Fourteenth Amendment, by use of a ruse, claiming they needed Mr. Woodson to provide a victim/witness statement. ECF 22, ¶ 3. And, plaintiff alleges that on August 5, 2014, the Police Officers were "intentionally and/or grossly negligent in their decision to forego searching Mr. Woodson for any weapons" when he was taken into custody and throughout the time that he was held at the police station. *Id.* In this regard, plaintiff contends that Batts failed to implement or enforce a policy requiring the search of arrestees (*id.* ¶¶ 74, 75), and he failed to properly train the officers concerning the "treatment of custodial persons outside and inside a district police station where other police officers and civilians are in close proximity and able to cause harm to the person in custody or be harmed by the person in custody . . . ." *Id.* ¶ 3.

In his Motion (ECF 31), Batts contends that the Amended Complaint has not stated a predicate constitutional violation by any defendant; has not sufficiently alleged "the necessary elements for a plausible *Monell* claim under any theory"; and fails to allege a § 1983 supervisory liability claim against Batts in his individual capacity. ECF 31-1 at 2-3.

### 1. *Monell* Generally

As noted, Batts was sued in his official capacity. A suit against Batts in his official capacity is, in effect, a suit against the BPD. In *Kentucky v. Graham*, 473 U.S. 159, 166 (1985), the Court said: "As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity." (internal citation omitted).

Pursuant to *Monell*, 436 U.S. 658, a municipality is subject to suit under § 1983. *See id.* at 690 (permitting a § 1983 claim against a municipality for money damages, based on an unconstitutional policy or custom of a municipality, resulting in a violation of a plaintiff's constitutional rights). But, liability attaches "only where the municipality *itself* causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original).

A viable § 1983 *Monell* claim contains two elements: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional "policy or custom" caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty. v. Brown*,

520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

In *Monell*, 436 U.S. 658, the Supreme Court determined that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only if those defendants were executing an official policy or custom of the local government that resulted in a violation of the plaintiff's rights. *Id.* at 690–91. The Court said that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694; *see also Love–Lane*, 355 F.3d at 782.

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403–04.

"An official policy often refers to 'formal rules or understandings ... that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir.1999) (alteration in *Semple* and citations omitted). "In addition, the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

"Outside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a 'custom or usage' with the force of law.'" *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987); *see Holloman v. Markowski*, 661 Fed. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, 137 S. Ct. 1342 (2017). In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must ... adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately

caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton, supra*, 489 U.S. at 389).

Moreover, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693–94. Rather, "[l]iability arises only where the constitutionally offensive acts of city employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan*, 743 F.2d at 229 (citing *Monell*, 436 U.S. at 694). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is ... the 'moving force' behind the particular constitutional violation." *Spell*, 824 F.2d at 1387 (internal citations omitted); *see Moore v. Howard County Police Dep't*, No. CCB–10–1430, 2010 WL 4722043, at *2 (D. Md. Nov. 15, 2010).

In *Connick v. Thompson*, 563 U.S. 51 (2011), the Supreme Court explained, *id.* at 60 (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). But, under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665–683 [ ] ). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691[ ]; *Canton*, 489 U.S. at 392[ ]; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) (collecting cases).

In the first instance, although not raised by the defense, it appears that, in the context of this case, the BPD is not the same as the municipality, *i.e.*, the City of Baltimore. Under Maryland law, the BPD has been a State agency, not a local agency, since 1867. *See Mayor & City Council of Baltimore v. Clark*, 404 Md. 13, 23, 944 A.2d 1122, 1128 (2008); *Clea v. Mayor & City Council of Balt.*, 312 Md. 662, 669-70, 541 A.2d 1303, 1306-07 (1988). If the BPD is an arm of the State, it is not a municipality subject to suit under *Monell*. *See Jeffers v. Harrison-Bailey*, JFM-16-cv-03683, 2017 WL 1089186, at *7 (D. Md. Mar. 21, 2017) ("[T]he MTA is an arm of the state, and not a local or municipal body. Therefore, [plaintiff] cannot bring a claim against the MTA under *Monell*."); *Burgess v. Balt. Police Dep't*, RDB-15-0834, 2016 WL 795975, at *6 (D. Md. 2016); *Clark*, 404 Md. at 23, 944 A.2d at 1128; *Balt. Police Dep't v. Cherkes*, 140 Md. App. 282, 310-12, 780 A.2d 410, 426-28 (2001).[9]

The BPD officers are generally considered State employees. *See Burgess*, 2016 WL 795975, at *6. Moreover, the City does not implement policy for the BPD. *See* BALT. CITY CHARTER, Art II, § 27 ("[N]o ordinance of the City or Act of any municipal officer shall conflict, impede, obstruct, hinder or interfere with the powers of the Police Commissioner."); *Cherkes*, 140 Md. App. at 312, 780 A.2d at 427–28. Indeed, "the City does not sufficiently control the BPD to be responsible for Baltimore police officer conduct under § 1983 (*i.e.*, they are not City employees)." *Estate of Anderson v. Strohman*, 6 F. Supp. 3d 639, 644 (D. Md. 2014); *see also Bradley v. Balt. Police Dep't*, 887 F. Supp. 2d 642, 646-48 (D. Md. 2012) (dismissing § 1983 suit against the City because it "does not exert sufficient control over the BPD to be subject to liability

---

[9] To my knowledge, the Fourth Circuit has not yet addressed this precise issue. *See Holloman v. Markowski*, 661 Fed. App'x 797, 800 (4th Cir. 2016) (per curiam) (declining to reach the City's argument that the BPD is a State agency).

for the latter's actions").  Therefore, there is no basis for a *Monell* claim based on actions of the BPD.

Because the issue was not raised, however, I shall assume that the plaintiff is entitled to lodge a *Monell* claim in connection with the BPD.

### 2. A Policy or Custom of Condonation

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'"  *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389).  A plaintiff must show "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'"  *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1386-1391).  Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct."  *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391).  However, only "'widespread or flagrant'" misconduct is sufficient.  *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387).  In contrast, "[s]poradic or isolated" misconduct is not.  *Owens*, 767 F.3d at 403.

As indicated, the Amended Complaint mentions the Fourth and Fourteenth Amendments, but only in the introductory "Jurisdiction" section. ECF 22, ¶¶ 1, 3. The most descriptive of those allegations states: "Defendant officers made an unreasonable seizure of the person of Tyree Woodson (deceased), thereby violating his rights under the Fourth and Fourteenth Amendments to the United States Constitution . . ."  *Id.* ¶ 3.  However, the alleged "policy or custom" about which plaintiff complains does not pertain to the arrest or seizure of Mr. Woodson.  Rather, it concerns the BPD's policy regarding searches of arrestees and detainees.  As to that policy, plaintiff posits inconsistent allegations.

First, plaintiff alleges: "Pursuant to BPD General Order J-13, all named Defendants had an affirmative duty to thoroughly search Mr. Woodson as a person just arrested on an arrest warrant taken into custody and brought into the District Station." ECF 22, ¶ 64. Yet, plaintiff then alleges the contrary, *i.e.*, that Batts "failed to maintain a mandatory policy requiring all officers [to] search persons in custody upon entering the precinct and after moving said person's [sic] in custody about the precinct." *Id.* ¶ 75. Further, plaintiff alleges that the defendant Police Officers "followed a department-wide practice of not searching custodial persons . . . ." *Id.* ¶ 94.

The thrust of plaintiff's claim begins with the allegation that Mr. Woodson was not searched when he initially entered the police vehicle or on arrival at the police station. Given the existence of General Order J-13, the Police Officers either deemed General Order J-13 inapplicable, or failed to abide by General Order J-13. Either way, plaintiff cannot logically premise a § 1983 *Monell* "policy or custom" claim on the absence of a policy requiring a search, given the allegations that the BPD had a General Order mandating such a search. Nor do the allegations suffice to show deliberate indifference to a search policy.

Further, plaintiff's allegations, as stated, do not evidence a plausible constitutional violation based on the Fourth Amendment. The Fourth Amendment, made applicable to the States through the Fourteenth Amendment, *Mapp v. Ohio*, 367 U.S. 643, 655 (1961), guarantees, *inter alia*, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend IV. To be sure, § 1983 provides a damages remedy for violations of the Fourth Amendment. *See, e.g.*, *Wilson v. Layne*, 526 U.S. 603, 609 (1999) ("§ 1983 allow[s] a plaintiff to seek money damages from government officials who have violated his Fourth Amendment rights."). However, plaintiff alleges that Mr. Woodson

was *not* searched. Thus, the Fourth Amendment's proscription against unreasonable searches and seizures is not implicated by plaintiff's contentions concerning the failure to search Mr. Woodson.

In her Opposition to the Batts Motion, plaintiff argues that the Fourth Amendment was violated when Mr. Woodson "was illegally arrested on a stale warrant . . . ." ECF 35-1 at 10. Plaintiff's assertion as to staleness is belied by her own exhibit (ECF 18-4). She also asserts that Mr. Woodson "had the right to not be arrested without probable cause," but he was "illegally arrested." ECF 35-1 at 14.[10]

Of relevance here, a plaintiff may not amend her complaint "by the briefs in opposition to a motion to dismiss." *Whiting-Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 334 (D. Md. 2012) (quoting *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1968 (D. Md. 1991), *aff'd*, 2 F.3d 56 (4th Cir. 1993)); *see also Zachair, Ltd. v. Driggs*, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (noting that a plaintiff "is bound by the allegations contained in its complaint and cannot, through the use of motion briefs, amend the complaint"), *aff'd*, 141 F.3d 1162 (4th Cir. 1998). Rule 8 "requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted). Even with that low bar, plaintiff did not plead claims regarding an illegal arrest of Mr. Woodson.

Plaintiff seems to recognize the omission. She asserts in her Opposition that she intends to amend her suit to plead illegal arrest, illegal detention, use of excessive force, and other claims

---

[10] Although plaintiff alleges that Mr. Woodson was placed in handcuffs, which is consistent with an arrest, other portions of the Amended Complaint suggest, as noted, that Mr. Woodson went voluntarily with the officers for questioning. ECF 22, ¶¶ 9, 11-14.

arising from Mr. Woodson's illegal seizure." ECF 35-1 at 15. But, intentions cannot carry the day.

In the absence of any factual allegations that state a plausible § 1983 claim that Mr. Woodson's constitutional rights were abridged, the Amended Complaint has not adequately alleged that the conduct of Batts and the BPD amounted to a persistent and widespread practice of indifference, so as to give rise to a custom or policy of condonation or tacit authorization of constitutional violations. *See Owens*, 767 F.3d at 402. Although a *Monell* plaintiff need not plead multiple instances of constitutional violations to prevail on a policy or custom claim, *Jordan by Jordan*, *supra*, 15 F.3d at 339–40, the factual allegations in this case are not sufficient under *Twombly* and *Iqbal* to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

**2. Failure to Train**

The Amended Complaint alleges that Batts and the BPD failed to train BPD officers "to protect members of the general public including Tyree Woodson against unreasonable risks of harm and death while in police custody." ECF 22, ¶ 73. In *Canton v. Harris*, *supra*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants ... such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."

Indeed, the manner in which a police force chooses to train its officers is "necessarily a matter of 'policy'...." *Spell*, *supra*, 824 F.2d at 1389. Therefore, "the inadequacy of police training may serve as the basis for § 1983 liability" but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388.

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Lewis v. Simms*, Civil Action No. AW–11–CV–2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, No. WDQ–09–2340, 2010 WL 93268, *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014). The *Connick* Court observed, 563 U.S. at 61: "To satisfy [§ 1983], a municipality's failure to train its employees in a relevant respect must amount to 'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." (Alteration in *Connick*); *see also Canton*, 489 U.S. at 388. Only then "can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *Canton*, 489 U.S. at 389.

Notably, even if "a particular officer may be unsatisfactorily trained [, that] will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390–91. The *Canton* Court reasoned, 489 U.S. at 391:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Although the procedural posture of this case distinguishes it from *Connick v. Thompson*, *supra*, 563 U.S. 51, *Connick* is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim. In *Connick*, the Court reiterated: "[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct will not suffice." *Id.* at 68 (alteration in *Connick*) (internal quotations omitted).

In *Connick*, respondent Thompson was prosecuted and convicted for attempted armed robbery and murder. *Id.* at 54. However, his convictions were overturned when it was discovered that the prosecution failed to disclose the existence of a certain crime lab report. *Id.* Based on the violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Thompson filed a § 1983 suit against Harry Connick, in his official capacity as the Orleans Parish District Attorney. 563 U.S. 54. He alleged, *inter alia*, a "deliberate indifference to an obvious need to train prosecutors in his office to avoid such constitutional violations." *Id.* at 57. The district court ruled that, in order to establish deliberate indifference, Thompson was not required to show a pattern of similar *Brady* violations,

when he could demonstrate that the need for training was "'so obvious.'" *Id.* at 58. The jury found

for Thompson and awarded him damages. *Id.* A divided Fifth Circuit affirmed. *Id.* at 57.

The Supreme Court considered whether a "district attorney's office [could be] held liable

under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54.  The

Court noted that the *Canton* Court "sought not to foreclose the possibility ... that the

unconstitutional consequences of failing to train could be so patently obvious that a city could be

liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Nevertheless,

the Court said, *id.* at 61:

> In limited circumstances, a local government's decision not to train certain
> employees about their legal duty to avoid violating citizens' rights may rise to the
> level of an official government policy for purposes of § 1983. A municipality's
> culpability for a deprivation of rights is at its most tenuous where a claim turns on
> a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823, 105 S.Ct.
> 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate
> training' "is "far more nebulous, and a good deal further removed from the
> constitutional violation, than was the policy in *Monell*").

In *Peters v. City of Mount Rainier*, No. GJH–14–00955, 2014 WL 4855032 (D. Md. Sept.

29, 2014), the plaintiff lodged a § 1983 claim for failure to train the police force. *Id.* at *5. The

complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of ... "fail[ing] to properly train and
> supervise its officers; fail[ing] to implement effective procedures for investigating
> allegations of police misconduct; fail[ing] to discipline officers who violate the
> Constitutional rights of private citizens through false arrests, malicious
> prosecutions, and brutal conduct; and generally fail [ing] to provide safeguards
> against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the

complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's

conduct resulted from said training.'" *Peters*, 2014 WL 4855032, at *5 (quoting *Lewis*, *supra*,

2012 WL 254024, at *1). He noted: "Peters has not even attempted to allege any such facts; instead,

he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers." *Id.* (citation to the record omitted). Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (i.e. the policy[-]or-custom element) is met. Without more, Peters has failed to adequately allege the existence of a policy or custom through the City's purported failure to train its officers." *Id.*

*Hall v. Fabrizio*, Civil No. JKB–12–754, 2012 WL 2905293 (D. Md. July 13, 2012), is also instructive. There, Judge Bredar dismissed a failure to train claim against the Baltimore Police Department because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker." *Id.* at *2.

In view of *Canton*, *Connick*, *Hall*, and *Peters*, among other cases, it is clear that stating a claim for failure to train requires more than bald assertions that police officers were not properly trained. Here, plaintiff baldly asserts that Mr. Woodson's death resulted from BPD's "fail[ure] to train, supervise and discharge the Defendant Police Officers for their failure to mandate proper searches of all persons in their custody . . . ." ECF 22, ¶ 75. She adds that if the "policy/procedure of subjecting persons in custody to a mandatory search . . . had been followed Mr. Woodson would not be dead." *Id.* Plaintiff relies on the same facts to support her claim for a custom or policy of deliberate indifference, which, as noted above, do not allege or suggest any particular constitutional violations.

Moreover, although plaintiff contends that BPD failed to train the Officer Defendants, she failed to identify a particular BPD training practice or any specific defect or omission in the BPD training program, and failed to draw a connection between the incident with Mr. Woodson and any

precise shortcoming in the BPD training program. This defect cannot be ignored. As explained in *Connick*, 563 U.S. at 61:

> "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." [*Board of Commr's of Bryan Cty. v. Brown*], 520 U.S. at 410, 117 S. Ct. 1382. Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program. *Id.*, at 407, 117 S. Ct. 1382.

The Amended Complaint offers no facts to support an inference that Batts and the BPD were on notice of any defects in the BPD training program. Plaintiff asserts that Batts had "specific knowledge" that the defendants previously allowed weapons inside the station (ECF 22, ¶ 75), but she cites no such example. Rather, plaintiff relies solely on conclusory assertions, without any information about the nature of existing training methods.

Accordingly, the allegations in the Amended Complaint fall short of stating a claim for failure to train. The *Monell* claims against Batts, in his official capacity, will be dismissed, without prejudice.

### 3. Supervisory Liability

Even in the absence of an unconstitutional policy or custom, a supervisor's "continued inaction in the face of documented widespread abuses ... provides an independent basis" for liability against a supervising official in his personal capacity for deliberate indifference or acquiescence "in the constitutionally offensive conduct of his subordinates." *Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir. 1984). It appears that plaintiff attempts to allege that Batts is personally subject to supervisory liability, pursuant to § 1983.

A public official or agent "may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior." *Iqbal*, 556 U.S. at 676; *see Monell*, 436 U.S.

at 691; *Love–Lane*, 355 F.3d at 782 (finding no respondeat superior liability under § 1983); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (finding no respondeat superior liability in a *Bivens* suit). "Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

The Fourth Circuit has stated: "A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013). In particular, to state a claim for supervisory liability under § 1983, a plaintiff must allege: "(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed 'a pervasive and unreasonable risk' of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to the knowledge was so inadequate as to show 'deliberate indifference to or tacit authorization of the alleged offensive practices,'; and (3) that there was an 'affirmative causal link' between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff." *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted); *see also Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). In other words, the liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Baynard*, 268 F.3d at 235 (quoting *Slakan*, 737 F.2d at 372).

With respect to the first element, "[e]stablishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm

of constitutional injury." *Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 373-74); *see Wilkins*, 751 F.3d at 226. As to the second element, "a plaintiff [o]rdinarily ... cannot satisfy his burden of proof by pointing to a single incident or isolated incidents ... for a supervisor cannot be expected ... to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Randall v. Prince George's Cnty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (alteration in *Randall* and internal quotations omitted). "Deliberate indifference, however, may be satisfied by showing [a] supervisor's continued inaction in the face of documented widespread abuses." *Id.* (alteration in *Randall* and internal quotations omitted); *see Wilkins*, 751 F.3d at 226–27. As to the third element, "'proof of causation may be direct ... where the policy commands the injury of which the plaintiff complains ... or may be supplied by the tort principle that holds a person liable for the natural consequences of his actions.'" *Wilkins*, 751 F.3d at 226–227 (quoting *Shaw*, 13 F.3d at 799).

In *Shaw*, 13 F.3d 791, a North Carolina State trooper shot and killed a suspect during the course of an arrest. Thereafter, the victim's family filed a § 1983 suit, as well as State law claims, against the trooper and several of his supervisors. *Id.* at 796–97. A supervisor, Stroud, filed an interlocutory appeal with respect to the district court's denial of his summary judgment motion. *Id.* at 797. The Fourth Circuit concluded that plaintiffs presented sufficient evidence to withstand summary judgment as to the causation element. *Id.* at 800–01.

According to the Court, the plaintiffs demonstrated that the supervisor "had knowledge of at least three incidents in which [the trooper] used excessive force which posed an unreasonable risk of harm to arrestees," yet the supervisor failed to discipline the officer. *Id.* at 800. The evidence showed the supervisor's knowledge of the trooper's "violent propensities." *Id.* Given such knowledge, said the Court, "it follows that [the supervisor] knew that [the trooper's] unchecked

service on the force posed a constant and dangerous threat to the welfare of arrestees." *Id.* (internal footnote omitted)

In *Baynard*, *supra*, 268 F.3d 228, a student who was repeatedly molested by a teacher over the course of several years sued the school principal, among others, under § 1983. *Id.* at 233–34. The claim against the principal was based on a theory of supervisory liability. *Id.* at 234–35. The principal appealed the district court's denial of summary judgment, and the Fourth Circuit affirmed. *Id.* at 234, 244. The Court determined that a jury could conclude that Malone was "deliberately indifferent" to the risk of the teacher's abuse, reasoning that she took no action to protect the student, despite knowing that the teacher was "very physical" with students and that students accompanied him on camping trips when no other adults were present. *Id.* at 235–36; *see also Slakan*, 737 F.2d at 375 (finding prison supervisors were liable for failure to implement policies restricting the use of force by guards where the supervisors knew of at least seven prior instances of the conduct that caused injury to the plaintiff).

Notably, Batts has not cited cases decided on a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). ECF 31-1 at 19-20. Instead, to argue that the Amended Complaint is deficient, Batts draws the Court's attention to summary judgment cases. *See, e.g.*, *Randall*, *supra*, 302 F.3d at 211 (affirming district court's award of summary judgment to the County based on plaintiff's failure to provide sufficient evidence to support that police maintained a custom of unconstitutional detention); *Shaw*, 13 F.3d at 801 (granting defendant's motion for summary judgment because plaintiffs presented insufficient evidence to establish supervisory liability); *Slakan*, 737 F.2d at 373 (affirming jury's decision to hold certain prison officials liable because plaintiff offered adequate evidence to establish supervisory liability).

In the posture of a motion to dismiss, *Lee v. Queen Anne's Cnty. Office of Sheriff*, Civil Action No. RDB–13–672, 2014 WL 476233, at *8 (D. Md. Feb. 5, 2014), is informative. In *Lee*, the plaintiff had allegedly driven through a stop sign. *Id.* at *1. But, he claimed that he was not driving the car. Nonetheless, a warrant was issued for his arrest. *Id.* Upon learning about the warrant, Lee surrendered to law enforcement and was "briefly incarcerated before being released on bond that same day." *Id.* He was later convicted of fraud, failure to stop, and driving with a revoked license. *Id.* But, a subsequent investigation of the events surrounding the stop revealed dashboard camera video evidence suggesting that the deputy had testified falsely. Moreover, the prosecutor purportedly concluded that the camera footage revealed no probable cause for the traffic stop. *Id.* at *2. As a result, the "charges" were subsequently *nol prossed*. *Id.*

Thereafter, Lee filed suit against the Queen Anne's County Office of the Sheriff. He alleged that the deputy's actions were "undertaken with malice and that he has suffered mental anguish, emotional pain and suffering, and financial loss as a result." *Id.* at *2. Further, Lee contended that the deputy "'acted with a wanton and reckless disregard for Plaintiff's civil rights by conducting an illegal traffic stop, causing an improper warrant to issue, [and] harassing Plaintiff and his family during a two-month period....'" *Id.* at *17 (quoting the amended complaint). And, pursuant to a theory of supervisory liability under § 1983, plaintiff sought to hold the Sheriff liable for the deputy's conduct. *Id.* at *8.

Lee alleged that the Sheriff "had constructive knowledge of his deputies' unconstitutional conduct" based on three incidents of prior conduct. *Id.* at *9 (quoting the amended complaint):

> a. On May 12, 2011, Queen Anne's County deputy John Dennis Hofmann pled guilty to second-degree assault after groping a woman inside his patrol car in August 2009. Deputy Hofmann is the brother of the Queen Anne's County Sheriff, Gary Hofmann. Hofmann remains employed by the Queen Anne's Office of the Sheriff[.]

b. In August 2007, the Queen Anne's County Office of the Sheriff suspended three deputies for misconduct that occurred during a traffic stop. The misconduct concerned violations of departmental policies and procedures having to do with vehicle searches. After the investigation, all three deputies were reinstated even though two deputies had been found to have violated policies and procedures.

c. On March 17, 2004, Queen Anne's County Deputy Sheriff Mark Barbre shot and paralyzed Andrew Pope, III during a traffic stop. Deputy Barbre had signaled for Pope to stop and pull over, but Pope continued to drive his vehicle until he reached his house, where he exited his vehicle and raised his hands in surrender. Deputy Barbre shot his firearm at Pope, striking him in the neck, paralyzing him.

Based on these facts, the plaintiff insisted "that these allegations are sufficient to support his claim that [the Sheriff] had constructive knowledge of his deputies' unconstitutional conduct" and acted with deliberate indifference. *Id.* Urging dismissal, the Sheriff argued that plaintiff relied too heavily on conclusory statements and lacked adequate factual detail to state a claim for supervisory liability. *Id.* at *8.

In effect, the question before the court was whether the suit "contain[ed] sufficient examples of past occurrences to state a valid claim and avoid dismissal at this early stage of the litigation." *Id.* at *9. The *Lee* Court found that the allegations "present[ed] a close case," but it ruled that the plaintiff adequately pleaded a claim for § 1983 supervisory liability. *Id.*

The Court noted that "the specific instances of misconduct adequately supplement that claim and demonstrate the requisite constructive knowledge and deliberate indifference." *Id.* In particular, it said that "[t]he 2007 event pertaining to the traffic stop clearly raises potential Fourth Amendment issues" similar to the case at bar. *Id.* The court also noted that "[t]he 2009 and 2007 incidents, as alleged, also suggest that the Sheriff's Office-and Sheriff Hofmann in particular-have failed to properly supervise and discipline the deputies because the deputies allegedly remained a part of the Sheriff's Office despite their misconduct." *Id.* The court observed: "Above and beyond

these incidents, [plaintiff's] claims involve repeated instances of harassment spanning a two month period." *Id.*

This case stands in marked contrast to *Lee*. The Amended Complaint here is woefully devoid of any facts to suggest that Batts had notice of conduct by any police officers in which they disregarded the search requirement, whether deliberately or inadvertently.

In *Jones v. Chapman*, 2015 WL 4509871, Civil Action No. ELH-14-2627 (D. Md. July 24, 2015), this Court considered, in the context of a motion to dismiss, an attempt to establish supervisory liability on the basis of general averments that a supervisor failed to respond to prior constitutional violations committed by members of the BPD. The suit arose from the unfortunate death of Tyrone West during a traffic stop, and asserted, *id.* at *5:

> It has been widely reported in the community, by news media, about the activities and excessive force allegations against members of the BPD, including specific Defendant BPD Officer Defendants in this suit. Some resulting in settlements and awards. The [C]ommissioner is either aware of or should have been aware of these matters, and, therefore, has actual or constructive knowledge that some of his BPD officers were engaged in conduct posing a pervasive and unreasonable risk of actual harm and constitutional deprivation to citizens such as Tyrone West[.]

The *Chapman* Court determined that such a conclusory assertion, *i.e.*, that Batts should have known about the unconstitutional conduct of "some of his BPD officers," standing alone, was not sufficient to state a claim for the personal liability of Batts. *Id.* at *24.[11]

Unlike in this case, in *Chapman* the plaintiff also recounted "three other police-citizen encounters (out of thousands of arrests annually) in Baltimore City," allegedly involving the use of excessive force by BPD officers. *Id.* at *24-26. One of the three encounters had occurred before Batts's appointment as Police Commissioner, one contained insufficient detail to permit the Court

---

[11] The lawyers who represented the plaintiffs in *Chapman* also represent plaintiff in this case. And, the language from *Chapman*, quoted above, appears in the Amended Complaint here, almost verbatim. ECF 22, ¶ 6. The only difference is in the name of the decedent.

to assess whether it suggested that Batts had knowledge of prior constitutional abuses, and the last had occurred just days before the incident involving Mr. West, such that no conclusion about Batts's action or inaction with respect to the incident could be drawn. *Id.*

After close scrutiny of the Complaint, this Court determined that the plaintiff had failed to allege facts to show that Batts was deliberately indifferent to a pervasive and unreasonable risk of unconstitutional action by the BPD. *Id.* at *26. Accordingly, the supervisory liability claim was dismissed as to Batts, without prejudice. *Id.*

Here, the allegations are far more scant than those presented in *Chapman* and *Lee*. As noted above, the Amended Complaint does not sufficiently allege any constitutional violation by any of the Police Officers. Moreover, the Amended Complaint contains no factual allegations that any of the Police Officers, or any other BPD officers, had engaged in conduct similar in any way to the alleged harmful conduct in this case. Plaintiff cites no other incidents involving failure to search a detainee who is taken into custody, and certainly none that resulted in the detainee thereafter taking his own life or harming another individual.

To support the claim of notice, plaintiff asserts: "Commissioner Batts and other ranking members of the Baltimore Police Department were put on notice of BPD's history of failure to properly secure district precincts when weapons and other contraband were found in police precincts prior to this incident." ECF 22, ¶ 76. However, the footnote in support of this assertion cites to two newspaper articles documenting inmates' possession of contraband in the Baltimore City Jail. *Id.* ¶ 76 n.3. Notably, the Baltimore City Jail is not a police precinct, nor is it operated by the BPD or the Mayor and City Council of Baltimore.

In *Holloman*, *supra*, 661 Fed. App'x 797, the plaintiff's son was fatally shot by police after he engaged in destructive behavior at his home due to mental illness. In her § 1983 suit, the

plaintiff pled four instances in which BPD officers had committed killings in the course of their duties, and referenced one article from the Baltimore Sun, reporting incidents of ten shootings in a year by the police, eight of which were fatal, and some of which involved people with mental health problems. *Id.* at 799-800. The Fourth Circuit upheld the dismissal of the suit as to the City, and summary judgment in favor of the officers, stating, *id.* at 800: "Holloman does <u>not</u> allege any facts showing that any of these incidents involved constitutional violations, let alone that the City improperly failed to discipline or train any officers."

Here, the Amended Complaint is devoid of factual allegations sufficient to show other instances of a detainee in possession of weapons or contraband in BPD precincts, in circumstances involving the Officer Defendants or any other officers. There is no basis on which to infer that Batts knew of prior constitutional abuses or disregard of BPD policies. Therefore, the supervisory liability claim against Batts will be dismissed, without prejudice.


### IV.     Officer Defendants' Motion

Maryland's wrongful death statute is found in Md. Code (2013 Repl. Vol.), §§ 3–901 through 3–904 of the Courts & Judicial Proceedings Article. C.J. § 3–902, titled "Liability for death," provides that wrongful death actions "may be maintained against a person whose wrongful act causes the death of another." C.J. § 3–902(a). "[A] wrongful death action is brought by the relatives of the decedent, seeking recovery for their loss as a result of the victim's death." *Jones v. Prince George's Cnty.*, 541 F.Supp.2d 761, 764 (D. Md. 2008) (citation omitted). Such an action "'is brought in the name of a person entitled to recover ....'" *Williams v. Work*, 192 Md. App. 438, 452, 995 A.2d 744, 753 (2010) (quoting *Walker v. Essex*, 318 Md. 516, 523, 569 A.2d 645, 648

(1990)), *aff'd sub nom. Ace Am. Ins. Co. v. Williams*, 418 Md. 400, 15 A.3d 761 (2011); *see Eagan v. Calhoun*, 347 Md. 72, 82, 698 A.2d 1097, 1102 (1997) (a wrongful death action "is brought by a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death"); *United States v. Streidel*, 329 Md. 533, 536, 620 A.2d 905, 907 (1993); C.J. § 3–904(d) ("damages awarded ... are not limited or restricted by the 'pecuniary loss' or 'pecuniary benefit' rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable for the death of ... (1) A spouse ... (3) A parent of a minor child ....").

In contrast, the Survival Act permits the personal representative of the decedent to bring any claims that the decedent could have brought had he lived, and to recover for any funeral expenses caused by the conduct of the defendants. Md. Code (2011 Repl. Vol.), § 7–401(y)(1)(ii) of the Estate and Trusts Article. In Case 1- Count I and Case 2- Count I, respectively, plaintiff asserts wrongful death and survival claims, both alleging that the intentional acts and gross negligence of the Officer Defendants resulted in Mr. Woodson's death.

Regarding proof of causation in the context of a wrongful death claim, then-Magistrate Judge Grimm explained in *Osunde v. Lewis*, 281 F.R.D. 250, 260 (D. Md. 2012):

> To succeed on a wrongful death claim under Maryland law, a plaintiff who qualifies as a beneficiary under the wrongful death statute "must show by a preponderance of the evidence that the conduct of [the] defendant was negligent and that such negligence was a proximate cause of the death of the decedent." *Weimer* [*v. Hetrick*, 309 Md. 536, 554, 525 A.2d 643, 652 (1987)]; *United Elec. Light & Power Co. v. State*, 100 Md. 634, 60 A. 248, 248–49 (1905); *see also* [Paul Mark Sandler & James K. Archibald, Pleading Causes of Action in Maryland 396 (4th ed.2008)] (listing four elements that a plaintiff must prove to succeed on a wrongful death claim: (1) the victim's death; (2) that the victim's death was proximately caused by the negligence of the defendant; (3) that the victim's death resulted in injury to the plaintiff, who falls within the category of beneficiaries defined by the statute; and (4) that the claim is brought within the applicable statutory period) ....

Under Maryland law, a person may be held liable for the suicide of another in two circumstances. "The first type occurs when the defendant's conduct actually causes the suicide . . . ." *Eisel v. Bd. of Educ. Of Montgomery Cnty.*, 324 Md. 376, 381, 597 A.2d 447, 450 (1991). That type of situation occurs when "the defendant's negligent conduct causes the insanity of another and (1) the insanity prevents the person from understanding the nature of the act and the certainty of harm or (2) the insanity makes it impossible to resist an 'uncontrollable impulse' that deprives the person of the capacity to govern the person's own conduct in a reasonable manner." *Sindler v. Litman*, 166 Md. App. 90, 111, 887 A.2d 97, 109 (2005).

*Sindler* arose from a motor vehicle accident in 1994, involving Ms. Sindler and her husband. Ms. Sindler sustained minor physical injuries as a result of the accident. In 1997, the Sindlers sued both the driver of the other vehicle and the driver's husband. *Id.* at 99, 887 A.2d at 102. In July 2004, several months before trial, Ms. Sindler committed suicide. *Id.* Subsequently, her husband filed an amended complaint, adding wrongful death and survival claims, alleging that the accident caused his wife's death. *Id.* at 103, 887 A.2d at 104.

Prior to trial, the circuit court granted summary judgment in favor of the defendants as to the wrongful death claim. *Id.* at 99, 887 A.2d at 102. In particular, the defendants argued before the trial court that "suicide is not a legally cognizable basis for a wrongful death claim because it is barred as a matter of law," and that the evidence in the case did not support such a claim. *Id.* at 103, 887 A.2d at 104. At a hearing on the summary judgment motion, the trial court considered deposition testimony from Ms. Sindler and from plaintiff's expert, Dr. Gary Lefer, who was Ms. Sindler's treating psychiatrist at the time of her death. *Id.* at 104, 108, 119, 887 A.2d at 105, 107, 114. In the trial court's view, Dr. Lefer's deposition testimony addressed "the possibility of

suicide" only "in general terms," which were "insufficient to maintain a cause of action" for wrongful death. *Id.* at 107, 887 A.2d at 106.

On appeal, the Maryland Court of Special Appeals affirmed the entry of judgment for the defendants as to the wrongful death claim. As an initial matter, the court addressed the relevant legal standards when a wrongful death claim arises from a suicide. Under one approach, "courts have held that suicide is a common law crime and, as such, it is a *per se* bar to a wrongful death claim." 166 Md. App. at 109, 887 A.2d at 108. In order to commit common law suicide, one must: "(1) take his own life; (2) be 'of years of discretion;' and (3) be of 'sound mind.'" *Id.* (quoting *Wackwitz v. Roy*, 244 Va. 60, 65, 418 S.E.2d 861, 865 (1992)). Under this "per se" standard, a court will "analyze the question of liability for suicide by determining whether the person who took his/her own life was sane within the meaning of common law suicide." 166 Md. App. at 110, 887 A.2d at 108 (citing *Wackwitz*, 244 Va. at 65–66, 418 S.E.2d at 864–65).

However, as the *Sindler* Court observed, the reasoning of Virginia and Fourth Circuit decisions endorsing the *per se* approach was grounded in the fact that suicide had remained a common law crime in Virginia. *Id.* at 110, 887 A.2d at 108 (citing *Wackwitz*, 244 Va. at 65–66, 418 S.E.2d at 864–65). In contrast, the *Sindler* Court said, "it is questionable at best whether Maryland recognizes suicide as a common law crime." 166 Md. App. at 111, 887 A.2d at 109 (citing *Wilmington Trust Co. v. Clark*, 289 Md. 313, 329, 424 A.2d 744, 754 (1981) ("Suicide is no longer a crime either in England or the majority of American jurisdictions, and no American jurisdiction punishes a suicide through forfeiture of goods or any other means."); *Mayne v. State*, 45 Md. App. 483, 488, 414 A.2d 1, 4 (1980) (declining to address whether suicide is a crime in Maryland)).

A second approach, identified by the *Sindler* Court as the "majority view," concludes that "suicide, as a consequence of a negligent act, is not legally cognizable under general principles of proximate causation, either because it is a superseding intervening cause or otherwise not a proximate cause." 166 Md.App. at 111, 887 A.2d at 109. That general rule, however, is subject to an exception, reflected in the Restatement (Second) of Torts ("Restatement") § 455. *Id.* Specifically, § 455 ("Acts Done During Insanity Caused by Negligent Conduct") states:

> If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity
>
> (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or
>
> (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

Characterizing the issue as "one of first impression in Maryland," the *Sindler* Court found "the majority approach, based on principles of proximate cause, to be more persuasive." 166 Md. App. at 112, 887 A.2d at 109. Indeed, it rejected the *per se* rule and expressly "adopt[ed] the Restatement approach, which is simply a statement of proximate cause in a specific context." *Id.*; *see also, e.g.*, *District of Columbia v. Peters*, 527 A.2d 1269, 1276 (D.C. 1987) (adopting § 455 standard); *Baxter v. Safeway Stores, Inc.*, 13 Wash. App. 229, 232–33, 534 P.2d 585, 588 (1975) (same); *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 524 (Tex. 1975) (same); *Fuller v. Preis*, 35 N.Y.2d 425, 429, 363 N.Y.S.2d 568, 322 N.E.2d 263, 265 (1974) (same).

Further, the *Sindler* Court observed, 166 Md. App. at 112–13, 887 A.2d at 109–10:

> Under the proximate cause analysis, the general rule is that "one may not recover damages in negligence for the suicide of another. The act of suicide is generally considered to be a deliberate, intentional, and intervening act which precludes a finding that a given defendant is, in fact, responsible for the decedent's death." *E.g.*, *Peters*, 527 A.2d at 1276 (citing *McLaughlin* [*v. Sullivan*, 123 N.H. 335, 337, 461 A.2d 123, 124 (1983) ] ); *see also Cleveland v. Rotman*, 297 F.3d 569, 572 (7th

Cir.2002) ("It is well-established under Illinois law that a plaintiff may not recover for a decedent's suicide following a tortious act because suicide is an independent intervening event that the tortfeasor cannot be expected to foresee."); *Watters v. TSR, Inc.*, 904 F.2d 378, 383 (6th Cir.1990) ("Generally speaking, it has been said, the act of suicide is viewed as 'an independent intervening act which the original tortfeasor could not have reasonably [been] expected to foresee.' " (Citations omitted)); *Jamison v. Storer Broadcasting Co.*, 511 F.Supp. 1286, 1292 (E.D. Mich.1981) ("If a person commits suicide in response to a mental condition, as distinguished from a mental illness, a prior tortfeasor, perhaps in part responsible for that condition, will not be liable because the act of the deceased is viewed as an independent intervening cause.") [other citations omitted].

The court reiterated that § 455 of the Restatement "provides an important exception to the general rule that suicide is a superseding intervening act or, in any event, that the negligent act was not the legal or proximate cause of the suicide." 166 Md. App. at 117, 887 A.2d at 112 (citing *Peters*, 527 A.2d at 1275). In essence, this provision "assumes that negligent conduct caused delirium or insanity of another and addresses the question as to when the negligent actor is liable for suicide committed by the delirious or insane person." 166 Md. App. at 117, 887 A.2d at 112.

As to § 455, the *Sindler* Court further explained, *id.* at 117–18, 887 A.2d at 112–13:

> Under the Restatement exception, "a plaintiff must show more than that the alleged negligent incident started a chain of circumstances that led to suicide." *Peters*, 527 A.2d at 1276. The plaintiff must prove that the defendant's action caused insanity, which prevented the decedent from realizing the nature of the act of suicide or resulted in the decedent's having an uncontrollable impulse to commit suicide, "in the sense that the decedent could not have decided against and refrained from killing himself, and because of such uncontrollable impulse, the decedent committed suicide." *Id.* (quoting *Orcutt* [*v. Spokane County*, 58 Wash.2d 846, 853, 364 P.2d 1102, 1105 (1961)] ).

As the *Sindler* Court noted, 166 Md. App. at 118, 887 A.2d at 113, the comments to § 455 provide further guidance. "Comment on Clause (a)" states:

> Clause (a) is applicable when the other's insanity is so extreme as to prevent him from understanding what he is doing or, if he understands what he is doing, from understanding its inevitable or probable consequences. It also applies to acts done during delirium.

The appellate court then referred to the "Comment on Clause (b)," *id.*, which provides:

This Clause applies where the other's insanity does not deprive him of his capacity to realize the nature or consequences of his act or from forming a purpose to kill or cause harm to himself and selecting means appropriate to accomplish his purpose, but his act is done under an insane impulse which is irresistible because his insanity has prevented his reason from controlling his actions. It, therefore, includes acts done under insane delusions if they are sufficiently strong to preclude resistance by such reason as his insanity leaves to the person laboring under them.

In addition, the *Sindler* Court quoted "Comment d," *id.*, which states as follows:

On the other hand, the fact that the actor's negligence causes harm to another which subjects him to recurrent attacks of extreme melancholia does not make the actor liable for death or other harm which the other deliberately inflicts upon himself during a lucid interval in an effort to terminate his life because of his dread of the increasingly frequent recurrence of these attacks.

Regarding proximate cause in the context of liability for suicide, the *Sindler* Court also quoted from a case citing a passage from Prosser, *Torts* § 49 (2d ed.1955), as follows, 166 Md. App. at 118–119, 887 A.2d at 113:

Although there are cases to the contrary, it seems the better view is that when [the injured person's] insanity prevents him from realizing the nature of his act or controlling his conduct, his suicide is to be regarded either as a direct result and no intervening force at all, or as a normal incident of the risk, for which the defendant will be liable .... But if the suicide is during a lucid interval, when he is in full command of his faculties but his life has become unendurable to him, it is agreed that his voluntary choice is an abnormal thing, which supercedes the defendant's liability.

The *Sindler* Court recognized that "generally suicide is an independent superseding act or, in any event, not proximately caused by the negligent act, which precludes imposing liability on a third party for the suicide of another." *Sindler*, 166 Md. App. at 113, 887 A. 2d at 110. But, after analyzing various authorities, the *Sindler* Court concluded that "whether Ms. Sindler was insane or delirious and that suicide resulted, not from her own voluntary conduct, but from lack of realization or an 'uncontrollable impulse' that was the product of insanity created by appellees, was a jury question that required expert testimony." 166 Md. App. at 119, 887 A.2d at 113.

In this case, plaintiff alleges that the "revelations and threats" made by Detectives Pow and Converse to Mr. Woodson "visibly change[d] [Mr. Woodson's] demeanor and temperament from 'very respectful' to extreme fear for his safety, extreme fear of the [Black Guerrilla Family], extreme fear for the immediate safety of his family, crying and fear of going away for a long time." ECF 22, ¶ 67. Although the Amended Complaint does not reference sanity or insanity, accepting all facts as true, and drawing all inferences in plaintiff's favor, as I must at this juncture, I conclude that the factual allegations against Defendants Pow and Converse, who conducted the interrogation, suffice to state claims for wrongful death and survival under the theory that Mr. Woodson's suicide was a direct result of their actions.

In addition, plaintiff's Amended Complaint contains language implicating reliance on the second circumstance allowing liability for the suicide of another. "The second type of case holds that a special relationship between a defendant and the suicidal person creates a duty to prevent a foreseeable suicide." *Eisel*, *supra*, 324 Md. at 381, 597 A.2d at 450.

To establish the existence of a special relationship between a law enforcement officer and a victim, "it must be shown that the local government or the [law enforcement] officer affirmatively acted to protect the specific victim or a specific group of individuals like the victim, thereby inducing the victim's specific reliance upon the [law enforcement] protection." *Cooper v. Rodriguez*, 443 Md. 680, 717, 118 A.3d 829, 851 (2015) (quoting *Williams v. Mayor & City Council of Baltimore*, 359 Md. 101, 150, 753 A.2d 41, 67-68 112-13 (2000)). The Maryland Court of Appeals has established that this determination "is to be done on a case-by-case basis" and, "when a dispute of material fact exists, that the determination as to whether a special relationship exists lies with the trier of fact." *Williams*, 359 Md. at 150, 753 A.2d at 68.

Plaintiff repeatedly alleges the existence of a "special relationship" between Mr. Woodson and the Officer Defendants. ECF 22, ¶¶ 3, 62, 84(i). Specifically, plaintiff asserts: "These [Officer Defendants] breached their direct duty to Mr. Woodson as a person in their custody and for whom each Defendant established a special relationship with, resulting in his death." ECF 22, ¶ 3; "[T]he [Officer Defendants] established a *special relationship* with Tyree Woodson upon taking him into their care and custody from removing him off the street to transporting him to the Southwestern District Police Station and locking him in a holding cell, handcuffed at times, to the cement wall," *id.* ¶ 62; and "All Defendants took into custody or maintained total control and custody over Mr. Woodson after his arrest establishing a 'special relationship' with Tyree Woodson, by virtue of their total control over Mr. Woodson. Upon his arrest Mr. Woodson relied on each Defendant officer's offer of protection and calmly agreed to ride to the Southwestern District Police Station." *Id.* ¶ 84(i).

At the motion to dismiss stage, it is premature to decide whether the facts alleged by plaintiff actually establish a special relationship. Plaintiff's contentions that Mr. Woodson was removed from the streets, handcuffed, transported to the police station, and placed in a holding cell, suggest that Mr. Woodson was in custody. And, Maryland law is not clear whether custody alone creates a special relationship. *See, e.g. Holson v. State*, 99 Md. App. 411, 428, 637 A.2d 871, 879 (1994) ("absent continuing custody or control of an inebriate, a police officer has no special relationship that creates any duty requiring the officer to protect the person from the consequences of his or her own acts").

Further, plaintiff repeatedly alleges that Mr. Woodson's demeanor visibly changed dramatically during his interrogation by Detectives POW and Converse, suggesting that such conduct would have and should have alerted the officers that Mr. Woodson posed some risk to his

own safety.  ECF 22, ¶¶ 34, 69, 84(iv).  In other words, plaintiff suggest that the suicide was foreseeable.  Assuming the truth of the facts alleged in the Amended Complaint, plaintiff has adequately pleaded a special relationship, sufficient to state a claim against Detectives Pow and Converse.

As to the other Officer Defendants, however, plaintiff has not alleged a factual basis for gross negligence, or even negligence, to establish their plausible liability for the suicide of Mr. Woodson.  The only viable theory, as discussed above, relates to the interrogation of Mr. Woodson and his behavior in its aftermath.  Plaintiff specifically alleges that Sergeant Price and Detective Thompson left the District Station prior to any interrogation of Mr. Woodson.  ECF 22, ¶ 22. Similarly, plaintiff alleges that Detective Carvell escorted Mr. Woodson into the District Station and the prisoner holding cell, but she does not allege that he had any contact with Mr. Woodson after the interrogation commenced.  *Id.* ¶¶ 20, 21.  Likewise, plaintiff alleges that Detective Dzambo permitted Mr. Woodson to use the private bathroom several hours before the interrogation began, but does not allege any contact during or following the interrogation. *Id.* ¶¶ 25, 26.

Finally, a careful review of the Amended Complaint reveals that the sole mention of any substantive action by Detective Michael Spinnato is contained in the "Jurisdiction" section:  "It is further alleged that the detaining officer, Detective Michael Spinnato, announced to Ms. McDougald that he was as [sic] a member of the warrant task force prior to placing Mr. Woodson in the rear of his vehicle."  ECF 22, ¶ 3.  In contrast, in the portion of the Amended Complaint alleging the "Facts Common to All Counts," plaintiff alleges that two other officers, Sergeant Price and Detective Thompson, approached Mr. Woodson at his home, took him into custody, and placed him in the back of the police cruiser.  ECF 22, ¶ 8, 9, 13. There is no mention in the "Facts"

section of the Amended Complaint of any actions taken by Detective Spinnato.[12]  Because plaintiff has not adequately pleaded facts to state a plausible negligence or gross negligence claim against any of these Officer Defendants, the claims against them will be dismissed, without prejudice.

Finally, in Case 2 – Count III, plaintiff asserts a separate claim for recovery of funeral expenses. In a survival action pursuant to E.T. § 7-401(y), a personal representative is allowed to recover funeral expenses, in addition to other damages. Thus, plaintiff's claim for funeral expenses is essentially duplicative of plaintiffs' survival action under E.T. § 7-401, asserted in Case 2-Count II.  The separate cause of action in Case 2-Count III will be dismissed, although plaintiff will be permitted to claim the funeral expenses as damages in the survival action against Detectives Pow and Converse.

## V.  Conclusion

For the reasons set forth above, all claims against Defendant Batts are dismissed, without prejudice.  As to the Officer Defendants' Motion to Dismiss, the *Monell* claims set forth in Case 1-Counts II and Case 2-Count II, and the claim for funeral expenses in Case 2-Count III, are dismissed.  In addition, all other claims against Sergeant Sterling Price, Detective Earl Thompson, Detective Mathew Dzambo, Detective Kevin Carvell, and Detective Michael Spinnato are dismissed, without prejudice.  The Officer Defendants' Motion is denied as to the remaining claims against Detective Mathew Pow and Detective Jeffrey Converse.

---

[12]  In plaintiff's Opposition to the Officer Defendants' Motion, she notes that "Def. Detective Spinnato is identified as the Primary Investigator in the case for which Mr. Woodson was arrested and taken into police custody."  ECF 18-1 at 2.  As noted herein, however, plaintiff cannot amend her complaint by raising factual allegations for the first time in her legal briefing. *See Whiting-Turner Contracting Co.*, 912 F. Supp. 2d at 334.  Furthermore, although not specifically considered in reaching the conclusions herein, plaintiff attached, as an exhibit to her Opposition to the Officer Defendants' Motion, a comprehensive police report of the incident, which also makes no mention of Detective Spinnato.  ECF 18-5.

An Order follows.

Dated:   March 15, 2019                                        _____/s/_____
                                                               Ellen L. Hollander
                                                               United States District Judge