UNITED STATES DISRTCIT COURT
FOR THE DISTRICT OF MARYLAND
Northern Division

VERDESSA McDOUGALD,       *

     *Plaintiff,*       *

v.       *     Civil No.: 1:17-cv-02898-SAG

DETECTIVE MATTHEW POW, et al.,   *

     *Defendants.*       *

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, Detective Matthew Pow and Detective Jeffrey Converse by their attorneys, Chaz Ball and Schlachman, Belsky, Weiner & Davey, P.A. and pursuant to Federal Rule of Civil Procedure 56, submits this memorandum of law in support of Defendants' Motion for Summary Judgment and states the following in support thereof:

*Introduction*

On July 23, 2018, Plaintiff, Verdessa McDougald, filed an Amended Complaint in the United States District Court for the District of Maryland, Norther Division, individually and as personal representative of the estate of  Tyree Woodson, against Baltimore Police Department Detective Michael Spinnato, Sergeant Sterling Price, Detective Earl Thompson, Detective Matthew Pow, Detective Matthew Dzambo, Detective Kevin Carvell, Detective Jeffrey Converse, and former Police Commissioner Anthony Batts, alleging wrongful death for gross negligence, a survival action for gross negligence, a survival action for funeral expenses and related *Monell* claims based on the suicide death of Tyree Woodon on August 5, 2014.

Plaintiff contends that Sergeant Price and Detectives Spinnato, Thompson, Pow, Dzambo, Carvell, and Converse, established a "special relationship with Mr. Woodson upon taking him into their care and custody and removing him off the street to transporting him to the Southwestern District Police Station and locking him in a holding cell, handcuffed at times, to the cement wall." Am. Compl. ¶ 62. Plaintiff further contends that "Defendants failed to use reasonable care to search and properly monitor Mr. Woodson while in their care and custody[,] directly resulting in the shooting death of Mr. Woodson." Am. Compl. ¶ 84.

On August 14, 2018, the Defendants filed a Motion to Dismiss requesting that the Court to dismiss with prejudice Plaintiff's Amended Complaint against the Defendant Detectives and Sergeant arguing that Plaintiff failed to allege facts creating a special relationship between Woodson and the Detectives that would give rise to a legal duty to protect Woodson from suicide, a failure to allege any conduct that would rise to the level of gross negligence, and the that the Decedent in this matter assumed the risk of his ultimately fatal injuries. Defendants also argued that Plaintiff's *Monell* claims against the Individually Named Defendant Detectives fails in that those claims, against individual officers are legally unsupported.

On March 15, 2019, Judge Ellen L. Hollander granted, in part the Motion to Dismiss, dismissing without prejudice the *Monell* claims set forth in Case 1-Counts II and Case 2-Count II, and the claim for funeral expenses in Case 2-Count III, and all claims against Sergeant Price, Detective Thompson, Detective Dzambo, Detective Carvell, and Detective Spinnato. Following, that order, the only remaining claims were Plaintiff's wrongful death and survival action claims against Detective Mathew Pow and Detective Jeffrey Converse. The Detective Pow and Detective Converse now move for summary judgment in their favor on those remaining claims.

*Standard of Review*

Federal Rule 56 states: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56 (a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247–48 (emphasis in original). The movant supports the motion for summary judgment by "citing to particular parts of materials in the record" and by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(A)–(B). In reviewing a motion for summary judgment, the Court must view the facts "in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

*Relevant Factual Background*

On July 25, 2014, Decedent Tyree Woodson and his fiancé Tahesha White were shot in the 2500 block of Hollins Street in Baltimore, Maryland. FIT Case #14J0028 Final Report, p. 4. On July, 30, 2014, Woodson's cousin Jerome McDougald was shot in the 2500 Block of Baltimore Street, in Baltimore, Maryland. *Id*. Mr. McDougald was the primary suspect in the shooting of Woodson and White. *Id*. Woodson was the primary suspect in Mr. McDougald's shooting. *Id*.

On August 5, 2014, Sergeant Sterling Price and Detective Earl Thompson of the Baltimore Police Department Warrant Apprehension Task Force were conducting surveillance on 2609 Rittenhouse Avenue in Baltimore, Maryland to apprehend Woodson in reference to a

warrant for attempted first degree murder and lesser included offenses related to Mr. McDougald's shooting. Exhibit A, FIT Case #14J0028 Final Report, p. 2. At approximately 10:45 a.m., Sergeant Price and Detective Thompson observed Woodson and his mother Verdessa McDougald leaving their home on 2609 Rittenhouse Avenue. Am. Compl. ¶ 7, 8. Woodson, having been shot in his left foot, was using crutches and wearing a medical boot on that foot. FIT Case #14J0028 Final Report, p. 2-3. After identifying themselves, Sergeant Price and Detective Thompson informed Woodson that he was needed for questioning in connection with a July 25, 2014 incident where Mr. Woodson was the victim. Am. Compl. ¶ 9. Woodson was cooperative. FIT Case #14J0028 Final Report, p. 3. Detective Thompson, standing behind Woodson, searched Woodson's shoulders, waistband, both pant legs, and "jingled" Woodson's pants. *Id.* Detective Thompson did not, however, search inside Woodson's medical boot as to not aggravate the injury. *Id.* Sergeant Price and Detective Thompson then handcuffed Woodson and placed him in the back of their police vehicle. Am. Compl. ¶ 11-13. Neither Woodson, nor Ms. McDougald were advised at that point that Woodson was under arrest. *Id.*; FIT Case #14J0028 Final Report, p. 3. Once Woodson was in custody, Sergeant Price called Sergeant James Fallon of the Southwestern District Detective Unit to advise that Woodson was in custody and being transported to the station. FIT Case #14J0028 Final Report, p. 3. Sergeant Price and Detective Thompson then drove Woodson to the Southwestern District Police Station, located at 424 Font Hill Avenue, Baltimore, Maryland 21223. Am. Compl. ¶ 16-17.

Sergeant Price and Detective Thompson then removed a still handcuffed Mr. Woodson from the police vehicle and escorted him into the building where custody was transferred to Detective Kevin Carvell. Am. Compl. ¶ 18 – 20. As Woodson was escorted through the Southwestern District Station, he was not handcuffed in order to allow Woodson to use his

crutches. FIT Case #14J0028 Final Report, p. 3. Detective Carvell then escorted Mr. Woodson to a holding cell where his right hand was handcuffed to the wall. Am. Compl. ¶ 20 - 21. Detective Carvell, having been advised by Detective Thomason that Woodson was searched, did not search Woodson. FIT Case #14J0028 Final Report, p. 3. Sergeant Price and Detective Thompson then left the district. Am. Compl. ¶ 22. Detective Carvell advised Woodson to call him if Woodson needed anything and secured the holding cell door. FIT Case #14J0028 Final Report, p. 3.

Woodson remained in the holding cell for approximately an hour before he asked to use the restroom for the first time Am. Compl. ¶ 24-28. Detective Matthew Dzambo, believing Woodson had been searched, unhandcuffed Woodson from the wall and escorted Woodson to the hallway restroom. FIT Case #14J0028 Final Report, p. 4. Woodson was not handcuffed as he was escorted in order to allow Woodson to use his crutches. *Id*. When Woodson and Detective Dzambo entered the restroom, Detective Dzambo searched the restroom and stall to ensure there were no weapons or contraband inside. *Id*. After searching the restroom, Detective Dzambo allowed Woodson to use the first stall. *Id*. After Woodson used the restroom, Detective Dzambo escorted Woodson back to the holding cell and again handcuffed Woodson to the wall.  *Id*.

During this same period, Sergeant Fallon and District Detective Unit detectives including Defendants Matthew Pow and Jeffrey Converse conducted a search of Woodson's residence. *Id*. During the search, a handgun and ammunition was recovered from Woodson's bedroom. *Id*.  Ms. McDougald and White were present during the search. Exhibit B, White Dep., 19:2-20:14. Detectives Pow and Converse then responded back to the Southwestern District Station. FIT Case #14J0028 Final Report, p. 4.

At around 2:20 p.m., Detectives Pow and Converse met with Woodson for the first time in the holding area. *Id*. When Detectives Pow and Converse entered the holding cell, Woodson

was handcuffed to the wall. *Id*. Because Woodson was respectful, they removed the handcuff. *Id*. Detectives Pow and Converse did not search Woodson because they believed that he had been previously searched. *Id*. Detectives Pow and Converse then Mirandized Woodson and advised him that they had located a handgun at his home and believed that it was the same gun used in the shooting of Mr. McDougald. *Id.* Detectives Pow and Converse then attempted to get Woodson to identify Mr. McDougald as the person who shot him and White. *Id*. Woodson appeared to be worried and expressed a desire to smoke a cigarette. *Id*. Woodson was then escorted, without handcuffs, to the rear lot of the district station to smoke. *Id*. Once Detective Pow, Detective Converse, and Woodson got to the rear of the station, Woodson pulled a cigarette and lighter from his pants pocket. FIT Case #14J0028 Final Report, p. 5. While Detectives Pow and Converse thought it was unusual that Woodson would have the cigarette and lighter, they were not alerted because "it was only a cigarette." *Id*. While smoking the cigarette, Woodson told the detectives that he would identify the person who shot him is he was allowed to call his fiancé *Id*.  Detective Pow then notified Sergeant Fallon of the situation and was advised to allow Woodson to make the call. *Id*.

Detectives Pow and Converse then escorted Woodson back to the holding cell. *Id*. While back in the holding cell, Woodson expressed concern about the safety and future of his family, and requested that his family be relocated. *Id.* Woodson expressed that he was a member of the Black Guerrilla Family, but that the gang did not trust him. *Id*. Woodson identified a picture of Mr. McDougald as the person who shoot him and White. *Id.* Detectives Pow and Converse then allowed Woodson to make the phone call to White. *Id*.

White, upset about the search of the home and still recovering from being shot weeks before answered the phone crying. White Dep. 29:3-30:3. From White's perspective, when

Woodson and White first stated speaking, it was a regular conversation, like any other time Woodson was arrested. *Id*. at 32:3-6. Woodson told White that he was at the police district for questioning and that the police were saying that he shot somebody. *Id*. at 30:1-4. According to White, Woodson told the people in the background that they were wrong and he did not do anything. *Id*. at 30:13-15. With respect to the criminal justice system process, Woodson expressed to White, something to the effect of "here we go again," referring to other criminal matters in which Woodson had successfully defended himself. *Id*. at 30:13-15; 31:3; 33:2-16. Woodson told White that he would call her once he got to Central Booking and Intake Facility. *Id*. at 30:17-17. As Woodson spoke to White and she continued crying, Woodson also began to cry. *Id*. at 30:20-31:4. Woodson also told White that "if something happens to me, I want you to know that I love y'all." *Id*. at 32:16-17. During the call, Woodson never expressed anything about harming himself. *Id*. at 35:9-11. Despite knowing Woodson for over six years and being his fiancé, nothing that Woodson said indicated to White that Woodson was a risk to harm himself. *Id*. at 35:21-36:4. Despite knowing Woodson for over six years and being his fiancé, nothing in Woodson's voice or manner of speech that indicated to White that Woodson was a risk to harm himself. *Id*. at 36:5-10. Despite knowing Woodson for over six years and being his fiancé, there was nothing about the conversation that indicated to White that it would be her last time speaking to Woodson. *Id*. at 33:12-16. Detectives Pow and Converse observed Woodson crying and heard him telling White that he was going to jail and that he loves her. FIT Case #14J0028 Final Report, p. 5.

After hanging up the phone, Woodson again requested to use the restroom. *Id*. At approximately 2:40 p.m., Detective Pow escorted Woodson to the hallway restroom without handcuffs. *Id*. Detective Pow opened the restroom door and allowed Woodson walk into the first

stall. *Id*. Woodson closed the stall door and dropped his pants. *Id*. Detective Pow stayed in the restroom, walked near a window. *Id*. Moments later, Detective Pow heard a loud "pop" and a clanking sound. *Id*. Detective Pow saw plaster fall from the ceiling and a gun fall to the floor next to Woodson. *Id*. Detective Pow opened the stall door and observed Woodson slumped back on the left side of the stall with a single gunshot wound to his head. *Id*. A few minutes later, medics arrived and Woodson was pronounced dead at 2:48 p.m. FIT Case #14J0028 Final Report, p. 6. The investigation revealed Woodson removed a Glock 23 .40 caliber handgun from his person, placed it in his mouth, and shot himself. *Id*.  An autopsy was performed the following day and Woodson's death was ruled a suicide. FIT Case #14J0028 Final Report, p. 8.

*Applicable Baltimore Police Department Policy*

In 2015, Baltimore Police Department officers were trained regarding assessing an arrestee's potential for committing suicide by complying with the mandates of General Order K-14, *Persons in Police Custody*. Exhibit C, Key Report, p. 9; Exhibit D, G.O. K-14. The relevant portions of the General Order pertaining to the potential suicide of an arrestee follow:

- Whenever a person is taken into custody:
  - Ensure the safety of the arrestee.

- When observing and arrestee, look for the following:
  - Statements that may indicate suicidal intent;
  - Signs of depression or humiliation;
  - Evidence of prior suicide attempts (scars, etc.);
  - Activity which would lead a prudent individual to suspect a potential for danger;
  - Evidence/information received from family, friends or other sources; or
  - information regarding previous arrest.

Key Report, p. 9- 10. G. O. K-14.

<u>ARGUMENT</u>

A wrongful death action "may be maintained against a person whose wrongful act causes the death of another," with "wrongful act" defined as "an act, neglect, or default . . . which would have entitled the party injured to maintain an action and recover damages if death had not ensued." *Mummert v. Alizadeh*, 435 Md. 207, 216 (2013) quoting Md. Code (1974, 2013 Repl. Vol.), Courts and Judicial Proceedings Article §§ 3-901(e), 3-902(a). The Survival Act permits the personal representative of the decedent to bring any claims that the decedent could have brought had he lived, and to recover for any funeral expenses caused by the conduct of the defendants. Md. Code (2011 Repl. Vol.), § 7–401(y)(1) (ii) of the Estate and Trusts Article.

Under Maryland law, "[t]here appear to be two broad categories of cases in which a person may be held liable for the suicide of another. The first type occurs when the defendant's conduct actually causes the suicide." *Eisel v. Bd. of Educ. of Montgomery Cty.*, 324 Md. 376, 381 (1991) "The second type of case holds that a special relationship between a defendant and the suicidal person creates a duty to prevent a *foreseeable* suicide." *Id*. (emphasis added). In the instant case, the Plaintiff claims that Detectives Pow and Converse acted in a grossly negligent manner that ultimately led to Woodson taking his own life.

As stated in greater detail below, because Detectives Pow and Converse did not act with gross negligence, did not actually cause Woodson's suicide, did not establish a special relationship with Woodson, and Woodson's suicide would not have been foreseeable to Detectives Pow and Converse, Detectives Pow and Converse are entitled to entry of summary judgment in their favor, as a matter of law.

I.    DETECTIVES POW AND CONVERSE DID NOT ACT WITH GROSS
      NEGLIGENCE WITH RESPECT TO WOODSON

**Gross negligence is not just big negligence**. For these purposes, **gross negligence** "must be sufficient . . . to establish that the defendant . . . had a wanton or reckless disregard for human life . . . . Only conduct that is of extraordinary or outrageous character will be sufficient to imply this state of mind."

*Stracke v. Estate of Butler*, 465 Md. 407, 421 (2019) quoting *Thomas v. State*, 237 Md.

App. 527, 537 (2018), rev'd on other grounds*, State v. Thomas*, 464 Md. 133

(2019) (quoting *State v. Kramer*, 318 Md. 576, 590 (1990)) (emphasis in original). "[S]imple

negligence is any conduct, except conduct recklessly disregardful of an interest of others, which

falls below the standard established by law for protection of others against unreasonable risk of

harm." *Stracke*, 465 Md.at 420 (internal quotations omitted). "On the other hand, [Maryland's

Court of Appeals] has explained that gross negligence is an intentional failure to perform a

manifest duty in reckless disregard of the consequences as affecting the life or property of

another, and also implies a thoughtless disregard of the consequences without the exertion of any

effort to avoid them." *Id*. at 420-421. The Court of Appeals has "made clear that a claim

for gross negligence 'sets the evidentiary hurdle at a higher elevation[.]'" *Id*. at 421

quoting *Beall v. Holloway-Johnson*, 446 Md. 48, 64 (2016).  Maryland's Court of Appeals has

described gross negligence as follows:

> something more than simple negligence, and likely more akin to reckless conduct; gross negligence is an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he [or she] inflicts injury intentionally or is so utterly indifferent to the rights of others that he [or she] acts as if such rights did not exist.

*Cooper v. Rodriguez*, 443 Md. 680, 708 (2015) quoting Barbre v. Pope, 402 Md. 157, 187 (2007)

(Citations, emphasis, and internal quotation marks omitted).

In this matter, Plaintiff alleges that Detectives Pow and Converse were grossly negligent in failing to re-search Woodson and in not recognizing Woodson's suicidal ideation. Neither alleged neglectful act on the part of Detective Pow or Detective Converse amount to grossly negligent conduct.

Detectives Pow and Converse's decision not to re-search Woodson does not even rise to the level of simple negligence. Sergeant Price and Detective Thompson of the Warrant Apprehension Task Force arrested Woodson on at 10:45 a.m. on August 5, 2014. Detective Pow and Converse did not come into contact with Woodson on that date until 2:20 p.m. The presumption by the Defendant Detectives that apprehension detectives who arrested Woodson and district detectives who took Woodson into the station adequately searched Woodson is reasonable. Further, there were no "regulations, guidelines, or protocols in place in the Baltimore Police Department at the time of this incident which required the defendant detectives to search a prisoner who had been arrested by other officers, brought to the district, and turned over to yet another officer." Key Report, p. 10. In fact, "[t]he accepted practice was that the investigating detectives relied on the officers who took the subject into custody to have conducted a thorough search rather than expose themselves to claims of harassment for putting the subject through another intensive search." *Id.* Even if the policy to search detainees was read or understood to mandate that each officer who encounters a detainee must conduct an additional search, violation of police guidelines is not even negligence per se, but instead a factor to be considered in determining the reasonableness of police conduct. *State v. Pagotto*, 361 Md. 528, 557 (2000). "A failure to carry out established procedures, without more, does not constitute deliberate disregard for the possibility that [a decedent] would take his own life." *Belcher v. Oliver*, 898 F.2d 32, 36 (4th Cir. 1990) ("Their failure to follow procedures [of taking shoes and

belt] established for the general protection and welfare of inmates does not constitute deliberate disregard for the medical needs of a particular intoxicated individual [who later committed suicide].")(internal quotations omitted) *See also Christian v. Owens*, 461 F. Supp. 72, 77 (W.D.Va. 1978) (no Eighth Amendment violation where officer allegedly failed to search a prisoner who committed suicide with a weapon hidden in his boot).

Similarly, Detectives Pow and Converse were not negligent, much less grossly negligent, in not recognizing Woodson's suicidal ideation. As an initial note, given that Detectives Pow and Converse believed Woodson was adequately searched it is unclear what additional steps they could have taken to assure Woodson's safety. Upon Woodson's request, Detective Pow allowed Woodson to use a restroom and gave Woodson a moment of privacy in a stall, at which point Woodson took his own life. Furthermore, according to Detectives Pow and Converse' training, Woodson would not have presented as in danger of self-harm. Baltimore Police Department officers as of 2015 were trained in specific factors to look to in determining if a detainee poses a risk to himself or herself through General Order K-14, *Persons in Police Custody*. Key Report, p. 9- 10. G. O. K-14. Specifically, those factors were: statements that may indicate suicidal intent, signs of depression or humiliation, evidence of prior suicide attempts (scars, etc.), activity which would lead a prudent individual to suspect a potential for danger, evidence/information received from family, friends or other sources; or information regarding previous arrest. Key Report, p. 9- 10. G. O. K-14. According to Detectives Pow and Converse and according to Woodson's fiancé White, Woodson never made any statements indicating suicidal intent. Instead, Woodson made forward-looking statements, including calling White from Central Booking, "here we go again" about the criminal justice process, arrangements being made for the safety of his family, and having to go to jail for some period of time. Detectives Pow and

Converse did not observe any evidence of prior suicide attempts on the part of Woodson. Detectives Pow and Converse were not aware of any activity which would lead a prudent individual to suspect a potential for danger. In fact, White, knowing Woodson for over six years and as his fiancé was not alerted to Woodson being a danger to himself by either the words he would saying or his manner or speech. Detectives Pow and Converse did not receive any information from Woodson's family or friends or other sources that would indicate that Woodson may attempt to harm himself. To the extent that Detectives Pow and Converse were aware of Woodson's prior arrests, nothing about those arrests would have signaled that Woodson may attempt to harm himself, especially considering he had been detained previously without incident. Finally, Detectives Pow and Converse did not observe Woodson exhibiting signs of depression or humiliation. Though by all accounts, while speaking with White, Woodson cried along with White, the expression of some emotion (crying) while faced with serious criminal charges does not reach the level of depression. Detectives Pow and Converses' decision not to immediately re-search or strip search Woodson at the point of a showing of emotion does not constitute gross negligence. Similarly, Detectives Pow's allowance for Woodson to use private stall and close the door to the stall does not constitute gross negligence.

Therefore, even in the light most favorable to the Plaintiff, she cannot prove gross negligence on the part of Detectives Pow and Converse and the Defendant Detectives are entitled to summary judgment as a matter of law.

II.     DETECTIVES POW AND CONVERSE DID NOT ACTUALLY CAUSE WOODSON'S SUICIDE

As to the "defendant's conduct actually caused suicide" category of liability for the suicide of another in Maryland, "liability is imposed upon a defendant for another's suicide when the defendant's negligent conduct causes the *insanity* of another and (1) the insanity prevents the

person from understanding the nature of the act and the certainty of harm or (2) the insanity makes it impossible to resist an 'uncontrollable impulse' that deprives the person of the capacity to govern the person's own conduct in a reasonable manner." *Sindler v. Litman*, 166 Md. App. 90, 111 (2005) (emphasis added). Plaintiff's Amended Complaint in no way alleges or could be argued to allege that Woodson at any point suffered from insanity that would prevent him from understanding the nature of the or consequences of the act of shooting himself, nor does it allege he was suffering from any "uncontrollable impulses" to cause such an injury. Additionally, Plaintiff has not designated any psychiatric or psychological experts to support such a contention. There is no evidence in this matter that Woodson was rendered insane.

Furthermore, even if Woodson was suffering from incapacitating insanity at the time of the fatal act, there was no action by Detectives Pow or Converse that reasonably could have caused that mental state. Detectives Pow and Converse did not cause any physical injury that led to psychosis, as alluded to in *Eisel*[1] or discussed in *Sindler*, nor are there any allegations of unusual or extreme behavior that could have irreparably harmed Woodson mentally. To the contrary, Detectives Pow and Converse allowed Woodson to smoke a cigarette, use his cellphone upon request, use a private restroom as needed, and treated Woodson with respect and dignity throughout the encounter. Absent any plausible causal link between the actions of the Detectives Pow and Converse and insanity of Woodson, recovery would be barred by Maryland's general rule that suicide is an "independent superseding act." *See Sindler*, 166 Md. App. at 100. Nothing in the encounter between Detectives Pow and Converse and Woodson gives rise to the high bar set by *Eisel* or *Sindler*.

---

[1] The *Eisel* Court cited to *Fuller v. Preis*, 35 N.Y.2d 425 (1974), in which it was found that "a negligent driver causes head injuries that lead to psychosis" as an example of the causation theory for liability for the suicide of another. *Eisel.*, 324 Md. at 381.

III.    DETECTIVES POW AND CONVERSE DID NOT ESTABLISH A SPECIAL
         RELATIONSHIP WITH WOODSON

As for the "special relationship and foreseeability" category of liability for the suicide of

another in Maryland, for a special relationship to exist between a law enforcement officer and a

victim of some harm "it must be shown that the local government or the [law enforcement]

officer affirmatively acted to protect the specific victim or a specific group of individuals like the

victim, thereby inducing the victim's specific reliance upon the [law enforcement] protection."

*Cooper v. Rodriguez*, 443 Md. 680, 717 (2014) (quoting *Williams v. Mayor & City Council of*

*Balt.*, 359 Md. 101, 112-13 (2000)). See also *Ashburn v. Anne Arundel Cty.*, 306 Md. 617, 628

(1986).  The Maryland Court of Appeals has established that this determination "is to be done on

a case-by-case basis" and, "when a dispute of material fact exists, that the determination as to

whether a special relationship exists lies with the trier of fact." *Williams*, 359 Md. at 150.

Maryland law is not clear whether custody alone creates a special relationship. *See, e.g.*

*Holson v. State*, 99 Md. App. 411, 428 (1994) ("absent continuing custody or control of an

inebriate, a police officer has no special relationship that creates any duty requiring the officer to

protect the person from the consequences of his or her own acts").  Special relationships in the

law enforcement context typically arise when police officers make specific offers of assistance

and protection beyond their regular prescribed duties. In *Williams*, the Maryland Court of

Appeals dealt with an officer who promised to remain at the home of a domestic abuse victim to

protect her from her abuser, even though the officer did not have a duty to do so. Because of this

specific promise, a special relationship was formed because the victim relied on that promise.

359 Md. at 150.

No such promise of extra care was given by any of the Detectives Pow and Converse in

the instant case.  The only threats to Woodson's safety referenced in the course of his interaction

with Detectives Pow and Converse regarded to outside threats, such as danger posed Black Guerilla Family members. This matter would be a much different case if Woodson expressed his fear of the Black Guerilla Family, Detectives Pow and Converse promised to protect him, then Detectives Pow and Converse never-the-less housed Woodson with Black Guerilla Family members. Not such promise for protection was made and no such reckless act on the part of the Detectives Pow and Converse took place.

Without any discussion or warning of suicidal tendencies, history, ideation, or clinical depression, either from Woodson himself, the Ms. McDougald, or White, there could be no expectation that Detectives Pow and Converse were actively acting to protect Woodson from himself. As such, no special relationship existed between Detectives Pow and Converse and Woodson.

IV.    WOODSON'S SUICIDE WOULD NOT HAVE BEEN FORESEEABLE TO DETECTIVES POW AND CONVERS

Plaintiff's entire theory of liability as to the "special relationship and foreseeability" category of liability for the suicide of another in Maryland also fails as a result of the complete lack of foreseeability for Woodson's suicide. *Eisel v. Bd. of Educ.*, 324 Md. 376 (1991) discussed "whether [a] duty [] may be breached by junior high school counselors who fail to inform a parent of suicidal statements attributed to the parent's child by fellow students where, when the counselors sought to discuss the subject, the adolescent denied ever making the statements." *Id.* at 377. The clear distinction between that matter and this present matter is that Woodson never made any statements evidencing suicidal inclination to anyone, much less to Detectives Pow and Converse. In discussing the policy factors, the *Eisel* Court found that "[f]oreseeability is the most important variable in the duty calculus and without it there can be no duty to prevent suicide." *Id.* at 386 (internal citation omitted). In discussing that point, the *Eisel*

16

Court held that the decedent's "suicide was foreseeable because the defendants allegedly had direct evidence of [the decedent's] intent to commit suicide," and specifically distinguished the cases from another "in which the counselor had no notice of contemplated suicide." *Id*.

In the Fourth Circuit, law enforcement officers violate the civil rights of those they have custody over when they display "deliberate indifference to serious medical needs." *Gordon v. Kidd*, 971 F.2d 1087, 1094 (4th Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). This standard encompasses the "duty to protect prisoners from self-destruction or self-injury." *Lee v. Downs*, 641 F.2d 1117, 1121 (4th Cir. 1981)). "[T]he key to deliberate indifference in a prison suicide case is whether the defendants knew, or reasonably should have known, of the detainee's suicidal tendencies." *Elliot v. Cheshire County*, 940 F.2d 7, 10-11 (1st Cir. 1991). There is no duty to screen a detainee for suicidal tendencies if officers have no knowledge of prior suicidal behavior. *Edwards v. Gilbert*, 867 F.2d 1271, 1275 (11th. Cir. 1989); see also *Belcher v. Oliver*, 898 F.2d 32, 35 (4th Cir. 1990).

In *Patten v. Nichols*, 274 F.3d 829, 845 (4th Cir. 2001), the Fourth Circuit discussed a matter involving an involuntarily committed psychiatric patient with chronic schizophrenia and co-morbid COPD, who complained to her doctors of breathing problems for several weeks before dying. All of the factors that make the facts of *Patten* a compelling case of deliberate indifference, a pre-diagnosed mental condition, the long length of incarceration, the medical training of the custodial agents, the victim dying from a non-self-inflicted cause, are completely absent in the present case. Moreover, the standard set forth in *Patten,* is not "deliberate indifference" that applies to the present case, but the lower *"professional judgment"* standard established by the Supreme Court in *Youngberg v. Romeo*. *Id*. citing *Youngberg v. Romeo*, 457 U.S. 307, 323 (1982) ("[T]he decision, if made by a professional, is presumptively valid; liability

may be imposed only when the decision by the professional is such a substantial departure from

accepted professional judgment, practice, or standards as to demonstrate that the person

responsible actually did not base the decision on such a judgment.") The Court in *Patten*

explicitly noted how that standard is inapplicable to situations like the present case.

> In our view, however, there are sufficient differences between pre-trial detainees and involuntarily committed psychiatric patients to justify the arguable inconsistency that springs from the application of *Youngberg*'s professional judgment standard to denial-of-medical care claims asserted by involuntarily committed patients.

*Patten*, 274 F.3d at 840.

However, despite having a fact pattern much more compelling than the present case, the

Court in *Patten* still ultimately concluded that the Plaintiff's "evidence is insufficient to survive

the defendants' motion for summary judgment." *Id* at 846.

In *Brown v. Harris*, 240 F.3d 383 (4th Cir. 2001), the Fourth Circuit found the following:

> In the end, if we assume that Ogden was told that Brown was suicidal, he simply took less action than he could have, and by his own admission, should have. J.A. 160-61. That does not, however, either negate the reasonableness of his response or mean that he acted with "deliberate indifference." At most, Ogden's failure to take additional precautions was negligent, and not deliberately indifferent, because by placing Brown on constant video surveillance, he simply did not "*disregard*[] an excessive risk to [Brown's] health or safety." *Farmer*, 511 U.S. at 837 (emphasis added). Negligence, however, does not give rise to a constitutional claim when the operative standard is "deliberate indifference." *See Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard -- a showing of mere negligence will not meet it."). As a result, we hold that there was no basis for a reasonable factfinder to conclude that Ogden acted with deliberate indifference to the risk which he knew.

*Id*. at 390-91.

Once again these facts are entirely distinguishable. While conversations regarding

suicidal tendencies were a factor in the Brown case, no such conversations occurred in the

present case. Furthermore, the fact that the court in *Brown* found that there was no basis to

support deliberate indifference, even taking conversations about suicidal tendencies into account, further illustrates why Detectives Pow and Converse are entitled to judgment in their favor.

In *Hanlin-Cooney v. Frederick County*, 2014 U.S. Dist. LEXIS 1724, involving an inmate suicide, the Plaintiff alleged that two of the defendant correctional officers "were responsible for performing '0523 check'" on inmates on the day that [the decedent] committed suicide, that [the decedent] was placed on 0523 checks, and that such checks are done on inmates at risk for self-harm." *Id*. at 37. Plaintiff in that matter also alleged "that another inmate told 'the correctional officers assigned to monitor' [decedent] that [decedent] had been crying out for help and threatening to commit suicide, but this information was 'ignored.'" *Id*. at 38. While cries for help and threats of suicide, like the suicidal statements in *Eisel v. Bd. of Educ.*, would tend to imply foreseeability, no such evidence exists in this matter. This Circuit has held that if information regarding prior suicide attempts is known to some, but not all of the custodial officers, the unaware officers are not acting with deliberate indifference in failing to prevent a suicide. *Gordon,* 971 at 1095. In the present case, Detectives Pow and Converse were never made aware of such information.

Even if Detectives Pow and Converse missed more subtle signs of suicidal behavior, that failure would not rise to the level of gross negligence. The Third Circuit has previously ruled that a custodial officer's failure to recognize the cuts on a prisoner's arm as "suicide hesitation" cuts "amounts only to negligence and therefore fails to support a claim under section 1983." *Freedman v. City of Allentown, Pa.*, 853 F.2d 1111, 1116 (3d Cir. 1988). No such warnings existed with respect to Woodson at the time of his death and therefore any signs of suicidal tendencies would be even more subtle than the ones dealt with in *Freedman*.

Detectives Pow Converse's alleged failure to properly search Woodson while he was in custody, absent knowledge that he posed a danger to himself, does not rise to the level of gross negligence. The Second Circuit upheld the dismissal of a complaint against a correctional officer accused of failing to search a cell prior to an inmate's stabbing because the correctional officer did not have knowledge that the two involved inmates had prior hostile incidents and that "deliberate indifference describes a *state of mind more blameworthy than negligence.*" *Lewis v. Swicki*, 629 F. App'x 77, 80 (2d Cir. 2015) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994)) (emphasis added). The event that gave rise to the suit in *Lewis*, a stabbing between two inmates, would be somewhat potentially foreseeable in a prison setting even absent specific knowledge that two particular inmates were feuding. In this matter, not only did Detectives Pow and Converse lack specific knowledge that Woodson was suicidal, but the underlying event, the suicide of a suspect on police property several hours into a productive interview, is far more uncommon and unexpected than a prison stabbing.

In *Tetterton v. Arctic Tankers, Inc.*, 116 F. Supp. 429, 431 (E.D. Pa. 1953) the court dealt with a ship master's liability for the suicide death of a seaman the ship master knew to be insane. The court held that even with knowledge of the seaman's insanity, the ship master's failure to search the seaman's bag, which contained the razor blades eventually used in the suicide, did not rise to the level of gross negligence. In the present case, Detectives Pow and Converse did not have the knowledge the ship master had.

Finally, though the matter involves an inmate murder rather than suicide, *Cooper v. Rodriguez*, 443 Md. 680 (2014), serves as an example of example of preventability and the high level of culpability necessary for gross negligence:

> At approximately 2:48 a.m., the bus departed for Supermax. At some point during the trip, Johns got up from his seat, reached over the seat in front of him, hooked his arm

around Parker's head from behind, pulled Parker's head over the back of the seat, and began choking Parker with his arm. Eventually, Johns released Parker, thinking that Parker was dead. At some point, Diggs, who was sitting next to Parker, got up from his seat and moved to a vacant seat across the aisle, leaving the space next to Parker empty. Although it was a violation of policy for inmates to get up and move around the bus, none of five correctional officers took any action. After the initial choking, Parker started to move and snore or breathe heavily. Johns got up, moved into the seat next to Parker (which had been vacated by Diggs), and began choking Parker again. During the attack, Johns pulled down on Parker's head while Parker tried to push up, and Johns held Parker's head while turning his body toward the aisle of the bus, "trying to snap [Parker's] neck off." Johns said, among other things, "this is what I do best." Johns cut Parker's neck with a razor blade that had been smuggled onto the bus, and Parker yelled loudly. After the second round of choking, Johns stuffed Parker's limp body between the two seats. There was blood on top of the back of the seat and Johns was covered in a large amount of blood. This brutal two-part attack occurred approximately seven and one-quarter feet from where Cooper [a correctional officer] was seated in the rear elevated cage, yet Cooper—who was required to be "alert and observant at all times"—claimed not to have witnessed the occurrence.

*Cooper v. Rodriguez*, 443 Md. 680, 692 (2015). These facts could not be further from those involved in the present case. Detectives Pow and Converse did not observe any outward signs that indicated Woodson was a risk of harming himself. Perhaps if Defendants ignored a statement indicating suicidal ideation, or saw Woodson put a gun to his own head, but failed to act, their actions could constitute gross negligence. However, Detectives Pow and Converse did not even find out that Woodson was trying to commit suicide or had the means to do so until it was already too late to act.

<u>CONCLUSION</u>

For the reasons advanced above, Defendant Detectives Matthew Pow and Jeffrey Converse request that this Honorable Court grant summary judgement in their favor as to all of Plaintiff Verdessa McDougald's remaining claims.

Respectfully submitted,


_____/s/_____
Chaz Ball (Bar No. 30044)
Schlachman, Belsky, Weiner & Davey P.A.
300 E. Lombard Street, Suite 1100
Baltimore, Maryland 21202
Phone:  (410) 685-2022
Fax:  (410) 783-4771
*Attorneys for Defendants*