**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **VERDESSA MCDOUGALD, et al.,** | * |
| **Plaintiffs** | * |
| -v- | * |
| | Civil Action No.: 1:17-cv-02898-SAG |
| **DETECTIVE MICHAEL SPINNATO,** et al | * |
| | * |
| **Defendants** | * |
| | * |

\* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Verdessa McDougald, et al., by and through their Attorneys, submit this memorandum of Law in Support of Plaintiffs' Response in Opposition to Defendants' Motion for Summary Judgment and state the following:

**INTRODUCTION**

Plaintiffs filed suit against the defendant officers for causing and contributing to the death of Tyree Woodson on August 5, 2015, when each had a duty to keep him safe as Mr. Woodson was in their care and custody at all relevant times. Discovery has concluded and depositions having been taken, Defendant officers now move for summary judgment against Plaintiffs on all counts premised essentially on viewing the facts in a light most favorable to the moving party.

References to exhibits A through G herein correspond to the following:

EXHIBIT A:  Complaint and Demand for Jury Trial
EXHIBIT B:  Application for Statement of Charges
EXHIBIT C:  Regional Warrant Apprehension Task Force 24-Hour Incident Report
EXHIBIT D:  BPD General Order J-13
EXHIBIT E:  September 9, 2019 EXPERT REPORT, Stanford O. Franklin; Neil Franklin
               Consulting LLC.
EXHIBIT F:  March 16, 2020 Deposition Transcript, Tahesha Juanita White

EXHIBIT G:   Report, p. MPIA 15 706 046

## STATEMENT OF FACTS

On August 5, 2015 at approximately 10:45 am, Tyree Woodson and his mother, Verdessa McDougald, were leaving their home on 2609 Rittenhouse Avenue to tend to morning appointments when they encountered Defendants Sterling Price and Earl Thompson of the Baltimore City Police Department Warrant Task Force.  Both Price and Thompson announced themselves as members of the warrant task force and that Mr. Woodson was needed for questioning regarding a recent incident where he had been a victim of a drive-by shooting. See Exhibit A, Complaint para. 7-9.  Mr. Woodson had previously been shot in his left foot, July 25, 2014, injuring his lower leg and affecting his ability to walk without pain.  See Exhibit A, Complaint, para. 10. Concerned for Mr. Woodson's safety given the nature and cause of his present injuries, both Ms. McDougald and Mr.  Woodson inquired about the suspects he was to view and length of time for the victim/witness statement.  Defendant Officer both Price and Thompson [then] promised both Mr. Woodson and Ms. McDougald that he would return Mr. Woodson to his home safely in just a few hours allowing him to go about his planned errands.  See Id. at para. 11-12.

Unbeknown to Mr. Woodson, this introduction and story was a rouse as Defendants Price and Thompson were actually arresting Mr. Woodson and taking him into custody for the alleged shooting and attempted murder of James McDougald on 7/30/14.  He was not, in the Defendants' eyes, a victim/witness merely providing a statement, but a suspect in a crime involving a handgun, and being investigated under CC# 148G13839. See Exhibit B, Application for Statement of Charges; see also Exhibit C, Regional Warrant Apprehension Task Force 24-Hour Incident Report[1].  Detectives Price and Thompson then placed Mr. Woodson in handcuffs to his rear, and

---

[1] Detective Spinnato is identified as the Primary Investigator in the case for which Mr. Woodson was arrested and taken into police custody.

2

ordered him to get into the back of the police cruiser. Mr. Woodson, relying on the word of Price and Thompson complied and advised his mother that he would return shortly. See Exhibit A, para. 21-14. Neither Detective Price nor Detective Thompson thoroughly searched Mr. Woodson for weapons or anything hazardous to himself, or any officer, prior to placing him into their police vehicle as required by Baltimore Police Department General Order J-13—mandating that a thorough search of all arrestees be conducted. See Id. at para. 15; see also, Exhibit D, BPD General Order J-13.

Mr. Woodson was then driven to the Southwestern District Police Station, located at 424 Font Hill Avenue, Baltimore, Maryland 21223, in an unmarked police vehicle reportedly arriving at about 11:05am. Upon arriving at the District Station, Baltimore City Police Officers maintained custody over Mr. Woodson and removed him from the vehicle, still handcuffed. Pursuant to the reporting of Detective James Fallon, Mr. Woodson was walked into the police station. At this point no officer attempted to search Mr. Woodson or inquire as to whether Mr. Woodson had been searched for his or officer safety and pursuant to the BPD General Order J-13. Mr. Woodson was then escorted further into the District station and into the secure area of the station by Detective Kevin Carvell. Still handcuffed, Mr. Woodson was walked to a prisoner holding cell, and his right hand cuffed to a cement wall by Detective Kevin Carvell, who also decided not to search Mr. Woodson. At this point Mr. Woodson was left unsearched, subjected to no pat-down for weapons or any dangerous/hazardous items or substances, See Exhibit A. at para.17-21, despite all involved defendants' knowledge that Mr. Woodson was arrested on a warrant for the alleged use of a handgun in the commission of a crime of violence. See Exhibit F, Progress Report 8/4/14, item 15—Detective Pow sent out flyers in reference to the warrant obtained for Tyree Woodson … flyers were disseminated via departmental email. While away from the station, reportedly between

the hours of 1245 and 1320, detectives James Fallon, Mathew Pow, Jeffrey Converse and Eric Johnson executed a search and Seizure warrant of Mr. Woodson's home and report recovering from Mr. Woodson's bedroom a black handgun. See Exhibit G, Report, p. MPIA 15 706 046.

Detectives Pow and Converse then returned to the station, met with Mr. Woodson, removed his handcuffs, opted not to search him "because they believed he was previously searched," then advised Mr. Woodson that a handgun was recovered from his personal bedroom which they believed was used to shoot his cousin on July 25, 2014. Mr. Woodson was allegedly *Mirandized* and then interrogated. To this Mr. Woodson appeared, in the opinion of Pow and Converse, worried. Mr. Woodson advised that he would in turn identify the person that shot him and his girlfriend but wanted to call his girlfriend first. Mr. Woodson further stated at this point that he was "very concerned about the safety and future of his family"; that he wanted his family relocated as he was a member of the Black Guerrilla Family (BGF) and they did not trust him. "Detectives Pow and Converse report that Mr. Woodson wanted to smoke a cigarette so they took him out back allowed him to do so. Both Detectives observed Mr. Woodson remove cigarettes and a lighter from his front pocket and immediately acknowledged the illegal contraband but decided to do nothing about it. Detectives Pow and Converse then escort Mr. Woodson back into the secured area of the District Station, again deciding not to search him prior to bringing him amongst their colleagues and other inmates." See Exhibit A, Complaint para. 31-32. In his phone call to his girlfriend, Tahesha White, Detectives Pow and Converse heard Mr. Woodson crying to Ms. White and advising that, "the police found the gun and he was going to jail, that he would be gone for a long time." See Exhibit G, Report, p. MPIA 15 706 046 – 047. Ms. White testified in her deposition that, "at first, I didn't really hear – like I heard people talking in the background, but wasn't screaming and shouting at first until we started getting into the middle of the conversation

… until he started crying and stuff and I started crying, then he was like I just want to let you know that if something happens to me, I want you to know that I love ya'll. And then [Ms. White] heard yelling again in the background and then the phone hung up. See Exhibit F, March 16, 2020 Deposition Transcript, Tahesha Juanita White, p. 32, lines 3-18.

Prior to Detectives Pow and Covers' custodial interrogation of Mr. Woodson; defendants' threat of criminal prosecution for attempted murder and other handgun related offenses; Mr. Woodson's realization of the real threat to his safety and the safety of his family[2]; and, the disclosure by Detectives Pow and Converse of the seizure of a handgun recovered from his personal bedroom allegedly associated with the recent shooting of his cousin, the only observation of Mr. Woodson was that he was "very respectful." See Exhibit G, Report, p. MPIA 15 706 046 – 047. Defendant Detectives Pow and Converse observed their revelations and threats to Woodson visibly change his demeanor and temperament from "very respectful" to extreme fear for his safety, extreme fear of the BGF, extreme fear for the immediate safety of his family, crying and fear of going away for a long time. Detective Converse reported Mr. Woodson as now being "demonstrative" upon allegedly identifying his cousin as the person that shot he and his girlfriend. See Exhibit G, Report, p. MPIA 15 706 047.

"Mr. Woodson is reported to have requested to use the private bathroom yet another time. His request was granted by Detectives Pow and Converse. Detective Pow then escorted Mr. Woodson to a private men's bathroom, un-cuffed and still unsearched. Detective Pow reports to have allowed Woodson to close the door on the private bathroom stall as he, Detective Pow, walked to the other end of the bathroom. While at the other end of the bathroom Detective Pow is reported to have heard a "pop." He went to the bathroom stall, opened it and observed Mr.

---

[2] Mr. Woodson allegedly disclosed to Detectives Pow and Converse, at this time, that he was a member of the Black Guerrilla Family (BGF) and that they didn't trust him. See Exhibit G, Report, p. MPIA 15 706 047

Woodson slumped back on the left side of the stall. It is reported that Officer D. Mattingly, author of the Baltimore Police Department Incident report, Complaint number 148H01894, at about 2:42 pm was pulling into the Southwestern District lot, approached the front desk and was immediately advised that an individual was injured in the men's bathroom." <u>See</u> Exhibit A, Complaint, para 34-38. "Officer Mattingly observed a Glock 23 behind a trash can where Detective Hollingsworth stated he had placed it." <u>See</u> <u>Id</u>. at para 43. When asked about the whereabouts of the gloves he was wearing upon moving the Glock 23, Detective Chris Hollingsworth advised that "the gloves were thrown in the trash container in the bathroom once I moved the suspect gun … I was never directed to not throw the gloves away." <u>See</u> Exhibit G, August 13, 2014 Chris Hollingsworth Follow-up statement.

> "Maryland police officers are trained to conduct a secondary search of all arrestees they assume custody and care of. These are common and necessary prisoner management safeguards within the policing profession, specifically applied when the arrestee has arrived at a secure facility from being arrested on the street. The significance is that the "street" environment does not always present favorable conditions for a thorough search, so the secondary search conducted within a secure facility is more likely to reveal concealed weapons and/or contraband.
> …
> Detectives Pow and Converse reported to the BPD Force Investigation Team that Mr. Woodson appeared to be worried and expressed the desire to smoke a cigarette. Both detectives escorted Mr. Woodson to the back lot where Mr. Woodson retrieved a pack of cigarettes and lighter from his pants pocket. Detectives Pow and Converse thought this to be unusual but failed to both confiscate the items and failed to conduct a search of Mr. Woodson
> …
> Detectives Pow and Converse, knowing that cigarettes and especially a lighter would have been confiscated during a search of Mr. Woodson, still failed to conduct a precautionary search of Mr. Woodson. Having a cigarette lighter in his possession creates a potentially dangerous condition where he could set a number of items on fire while in custody. This resulted in the third missed opportunity for discovering the handgun that Mr. Woodson had concealed on his person.
> …

6

> Additionally, knowing that Mr. Woodson was arrested for attempt 1st degree murder, attempt 2nd degree murder, 1st degree assault, 2nd degree assault, reckless endangerment, dangerous weapon w/intent to injure, handgun on person and discharge of firearm, and now having knowledge of a handgun used by Mr. Woodson in a recent shooting had just been seized form his residence, he should have been viewed as armed and dangerous, requiring an immediate strip search. Not strip searching Mr. Woodson is in direct violation of BPD General Order J-13.
>
> …
>
> Detectives Pow and Converse reported that Mr. Woodson was crying while speaking to his girlfriend via telephone and he stated to her that the police found the gun and he was going to jail. He advised her that he would be gone for a long time, indicating that he was going to jail and he loved her. When Mr. Woodson concluded the phone call with his girlfriend, he asked to use the restroom to 'clear his head.'
>
> …
>
> Mr. Woodson's demeanor and comments to his girlfriend, witnessed and reported by Detectives Pow and Converse, are clear indicators of depression, which according to BPD General Order K-14, should have been red flags spawning concern for focused attention from the detectives."

See Exhibit E, September 9, 2019 EXPERT REPORT, Stanford O. Franklin; Neil Franklin Consulting LLC., pp. 13-16.

"Mr. Woodson was transported to the Office of the Chief Medical Examiner where an autopsy was conducted. Relying solely on the statements of Baltimore City Police Officers at or near the scene, it was concluded that Mr. Woodson was found in the bathroom with a handgun next to him. An autopsy was performed the following day and showed a single intraoral gunshot would which caused significant injuries to the brain skull. No additional injuries were noted[3]. Based on police investigation, the manner of death is classified as suicide." See Exhibit A, para. 47- 48.

## STANDARD OF REVIEW

---

[3] Page 5 of Mr. Woodson's Autopsy report reflects a pathologic diagnosis including a "remote gunshot wound to his left foot." That wound path direction and discharge range was indeterminate.

Fed. R. Civ. P. 56(a) reads in pertinent part: "A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law..." The existence of an issue of material fact to entitle the non-moving party to be able to proceed onward to trial is not required to be resolved conclusively in favor of that party. All that is required is that sufficient evidence supporting the claimed factual dispute be present to require a jury or judge to resolve the differing versions of the truth at trial. See First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-289 (1968).

On Summary Judgment the inferences to be drawn from the underlying facts contained in the moving party's materials are to be viewed in a light most favorable to the party opposing the motion. See United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). The Court must accept all of the non-moving party's properly supported fact assertions as true and give the benefit of all reasonable inferences that can be drawn from the record before it. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## ARGUMENT

### I. WHETHER DETECTIVES POW AND CONVERSE ACTED WITH GROSS NEGLIGENCE WITH RESPECT TO WOODSON IS A QUESTION FOR THE FACT-FINDER UNDER THE FACTS OF THIS CASE.

Whether Defendants Pow and Converse acted with gross negligence is a question for the fact-finder under the facts of this case.

Maryland Courts have equated gross negligence with "willful and wanton misconduct," a "wanton or reckless disregard for human life or for the rights of others." Foor v. Juvenile Services Admin., 78 Md. App. 151, 170 (quoting White v. King, 244 Md. 348 (1966)). It has also been

described as an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another, and also implies a thoughtless disregard of the consequences without the exertion of any effort to avoid them. Stated conversely, a wrongdoer is guilty of gross negligence or acts wantonly and willfully only when he inflicts injury intentionally or is so utterly indifferent to the rights of others that he acts as if such rights did not exist. Liscombe v. Potomac Edison Co., 303 Md. 619, 635 (1985) (quoting Romanesk v. Rose, 248 Md. 420, 423 (1968)).

The term "gross negligence" has been described as an amorphous concept, resistant to precise definition. Rodriguez v. State, 218 Md.App.573, 598, 98 A.3d 376 (2014).

> "Whether or not gross negligence exists necessarily depends on the facts and circumstances in each case. It is usually a question for the jury and is a question of law only when reasonable men could not differ as to the rational conclusion to be reached."

Id. at 598-99)( explaining that the question of whether a defendant's conduct rises to the level of gross negligence is a question for the trier of fact to decide); see also Liscombe v. Potomac Edison Co., 303 Md. 619, 635, 495 A.2d 838 (1985).

Moreover, contrary to the assertion of defendant officers, the standard for deliberate indifference to an arrestee is broader than an inquiry into an arrestee's tendencies to commit suicide. The deliberate indifference standard relates to "[t]he 'process' that the Constitution guarantees in connection with any deprivation of liberty," imposing on the government a "continuing obligation to satisfy certain minimal custodial standards." Collins, 503 U.S. at 127-28." See Slaughter v. Mayor of Baltimore, 682 F.3d 317, 321, 2012 U.S. App. LEXIS 11482, *8-9, 2012 WL 2052120. "A lower level duty of culpability may amount to a substantive due process violation in those situations where the government is required 'to take care of those who have already been deprived of their liberty'—such as pretrial detainees, persons in mental institutions,

convicted felons, and persons under arrest. See Collins, 503 U.S. at 127. In those circumstances, the Court has held that the government's deliberate indifference to the care of persons in its custody can shock the conscience for purposes of finding a substantive due process violation. See Lewis, 523 U.S. at 849-50. Accordingly, the reasonableness of defendants actions/innactions taken is judged in light of the defendant's actual knowledge of the risk. Brown, 240 F.3d at 390 (citing Liebe v. Norton, 157 F.3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken))." See Hanlin-Cooney v. Frederick County, 2014 U.S. Dist. LEXIS 17243, *32-33.

Here, no precautions were taken to search Mr. Woodson for weapons or other contraband despite Mr. Woodson's obvious desperation, cries for help, actual requests that his family be relocated into protective custody and away from the BGF; and, Defendant's personal knowledge of Mr. Woodson's charging documents and the alleged discovery of a handgun in Mr. Woodson's bedroom moments prior. Here, absolutely no effort was made to assuage Mr. Woodson's obvious fear and desperation for his own safety inside and outside of the jail. Defendants Pow and Converse, like the inmate defendants in Hanlin-Cooney, completely failed to consider the complaints, desperation and cries for help of Mr. Woodson evincing a deliberate indifference to a serious safety need of Mr. Woodson.

"Liability under a deliberate indifference standard requires two showings: (1) 'the evidence must show that the official in question subjectively recognized a substantial risk of harm;' and (2) the evidence in question must show that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.' Parrish v. Cleveland, 372 F.3d 294, 303 (4th Cir. 2004). As to both elements, ' … the official actually must have recognized that his actions were

inappropriate.' Rich v. Bruce, 129 F.3d 336, 340 n.2 (4th Cir. 1997)." See Montague v. Conroy, 2005 U.S. Dist. LEXIS 43419, *14, 2005 WL 5545697.

Here, Mr. Woodson's death is a significant physical injury and prior to his death Mr. Woodson's literal cries for help and obvious emotional desperation qualify as emotional injury. The facts viewed in a light most favorable to Plaintiffs demonstrate Defendant officers recognized their failures to search Mr. Woodson violated BPD General Order J-13—mandating a thorough Search of all arrestees be conducted. See Exhibit G (revealing that Defendants Pow and Converse observed Mr. Woodson pull contraband (a lighter and cigarettes) out of his right front pocket and took this action to be 'unusual'). Finally, Defendants' failure to assuage Mr. Woodson's desperation was deliberate indifference in light of Mr. Woodson's fear for his immediate safety and the safety of his family; retribution from the Black Guerrilla Family; Defendant officers' knowledge of Mr. Woodson's arrest; Mr. Woodson's change in circumstance, coupled with their personal knowledge of Mr. Woodson's access to weapons and an acknowledgment that no officer took the time to follow BPD general order J-13. Pow and Converse all illustrated a deliberate indifference to the welfare of Mr. Woodson. Summary judgment is, therefore, not appropriate.

Here, Detectives Converse and Pow "reported that Mr. Woodson appeared worried when they interrogated him at 1420 hours about the handgun seized from his bedroom earlier during the execution of a search and seizure warrant. Mr. Woodson's nervousness led to him wanting to smoke a cigarette, which they permitted him to do and once he finished, they took him back inside the Southwest station to further the interrogation … Detectives Pow and Converse reported that Mr. Woodson was crying while speaking to his girlfriend via telephone and he stated to her that the police found the gun and he was going to jail. He advised her that he would be gone for a long time, indicating that he was going to jail and he loved her. When Mr. Woodson concluded the

phone call with his girlfriend, he asked to use the restroom to "clear his head." See Exhibit E, pp. 13-14.

"In determining if Detectives Pow and Converse should have recognized that Mr. Woodson was exhibiting signs of depression, which may indicate suicidal intent, we are referred to BPD General Order K-14 "Persons in Police Custody," which reads in part:

Member of The Agency – When observing an arrestee, look for the following:
a. Statements that may indicate suicidal intent;
b. Signs of depression or humiliation;
c. Evidence of prior suicide attempts;
d. Activity which would lead a prudent individual to suspect a potential for danger;
e. Evidence/information received from family, friends or other sources; or
f. Information regarding previous arrests.

Detectives Pow and Converse reported that Mr. Woodson appeared worried when they interrogated him at 1420 hours about the handgun seized from his bedroom earlier during the execution of a search and seizure warrant. Mr. Woodson's nervousness led to him wanting to smoke a cigarette, which they permitted him to do and once he finished, they took him back inside the Southwest station to further the interrogation. Once back inside, it is reported that Mr. Woodson expressed to Detectives Pow and Converse that he was very concerned about the safety and future of his family. He wanted his family relocated because he is a member of the Black Guerrilla Family (BGF) and they didn't trust him. It is well known by Baltimore police officers that the BGF is a very violent gang, responsible for many murders in Baltimore City. Detectives Pow and Converse reported that Mr. Woodson was crying while speaking to his girlfriend via telephone and he stated to her that the police found the gun and he was going to jail. He advised her that he would be gone for a long time, indicating that he was going to jail and he loved her. When Mr. Woodson concluded the phone call with his girlfriend, he asked to use the restroom to "clear his head." Mr. Woodson's demeanor and comments to his girlfriend, witnessed and reported

by Detectives Pow and Converse, are clear indicators of depression, which according to BPD General Order K-14, should have been red flags spawning concern for focused attention from the detectives." See Exhibit E, pp. 13-14.  Viewing the facts in a light most favorable to Plaintiffs, the non-moving party, and pursuant to Plaintiffs' expert Neil Franklin, it is concluded to a reasonable degree of reasonable certainty that the actions and/or inactions of Detective Mathew Pow and Detective Jeffrey Converse rose to the level of gross negligence and resulted in the death of Mr. Tyree Woodson.  See Exhibit E, pp. 14.  Summary judgment is not appropriate.

## II. DEFENDANTS WERE THE DIRECT AND FORSEEABLE CAUSE OF MR. WOODSON'S DEATH AND ESTABLISHED A SPECIAL RELATIONSHIP WITH MR. WOODSON UPON ARRESTING HIM AND KEEPING HIM IN CUSTODY UNTIL HIS DEATH

As noted above, under the facts and reasonable inferences drawn in this case, there can be no doubt that Defendants, after their custodial interrogation of Mr. Woodson and instilling a deathly fear for his immediate safety and the safety of his family, caused Mr. Woodson's physical and emotional breakdown at the Southwestern District Station; leading to his immediate death. Further, the breach of Defendants' duty to Mr. Woodson, an arrestee in their custody, caused and contributed to Mr. Woodson's injury and immediate death.

"A tort duty is an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection. Among the variables to be considered in determining whether a tort duty should be recognized are: the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for

breach, and the availability, cost and prevalence of insurance for the risk involved" See Eisel v. Board of Educ., 324 Md. 376, 377 (1993).

"When a state takes a person into its custody and holds him there against his will, the constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being … [t]he affirmative duty to protect arises not from the state's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.  In the substantive due process analysis, it is the state's affirmative act of restraining the individual's freedom to act on his own behalf-- through incarceration, institutionalization, or other similar restraint of personal liberty--which is the deprivation of liberty triggering the protections of the due process clause, not its failure to act to protect his liberty interests against harms inflicted by other means." See Patten v. Nichols, 274 F.3d 829, 831, 2001 U.S. App. LEXIS 26841, *1

Nevertheless, Plaintiff agrees that Defendants' additional duty to Mr. Woodson is illustrated through Eisel v. Bd. Of Educ. of Montgomery Cty., 324 Md. 376, 381 (1991), in that under Maryland jurisprudence there appear to be two broad categories under which a person may be held liable for the suicide of another: 1) Defendants conduct actually causes the suicide; or 2) a special relationship existed between the defendant and the suicidal person creating a duty to prevent a foreseeable suicide.  Under the facts of this case and reasonable inferences drawn therefrom, both categories are met.

Regarding category number 1, the facts viewed in a light to the Plaintiff, the non-moving party, demonstrate that Mr. Woodson was simply "very respectful" prior to Detectives Pow and Convers' custodial interrogation of him; threats of criminal prosecution for attempted murder and other handgun related offenses; Mr. Woodson's realization of the imminent threat to his safety and the

safety of his family; Mr. Woodson's extreme fear of the BGF gang; and, Detectives Pow and Converse's disclosure that they recovered a handgun from Mr. Woodson's personal bedroom and associated it with the recent shooting of his cousin.

Detectives Pow and Converse further admit observing Mr. Woodson's visible change in demeanor and temperament from "very respectful" to extreme fear for his safety, extreme fear of the BGF, extreme fear for the immediate safety of his family, crying and fear of going to jail for a long time. All of which immediately followed the above noted revelations and threats to him. Pow and Converse were on direct notice of Mr. Woodson's desperation, genuine fear for himself and his family's immediate safety (in and outside of jail) along with the specific knowledge that Mr. Woodson had not been thoroughly searched and had access to firearms. Nevertheless, Defendants did nothing, and made no effort, to assuage Mr. Woodson's obvious desperation and fears. Moreover, "it is well known by Baltimore police officers that the BGF is a very violent gang, responsible for many murders in Baltimore City." See Exhibit E, p. 14.

Regarding category 2, the facts viewed in a light most favorable to Plaintiffs demonstrate that Mr. Woodson was arrested at his home, brought to the Southwestern District in handcuffs and remained in the custody of Defendants until his death, thus establishing a special relationship of custody between he and each defendant officer creating a duty on the part of the officer to protect the victim. See Cooper v. Rodriguez, 443 Md. 680, 686 (2015).

Defendants had a continuing obligation to satisfy certain minimal custodial standards for Mr. Woodson. Summary Judgment is not appropriate here.

## **CONCLUSION**

For the reasons stated above, it is respectfully requested that this Honorable Court deny Defendant Detectives Pow and Converse' Motion for Summary Judgment.

Respectfully submitted,

/s/
Latoya Francis-Williams, Bar ID 29957
A. Dwight Pettit, Bar ID 01697
Law Office of A. Dwight Pettit, P.A.
3606 Liberty Heights Avenue
Baltimore, MD  21201
(410) 542-5400 (office)
Latoya.f.williams@gmail.com

*Attorneys for Plaintiffs*