**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|                                  |   |                           |
|----------------------------------|---|---------------------------|
| **VERDESSA McDOUGALD,**          | * |                           |
|                                  | * |                           |
| **Plaintiff,**                   | * |                           |
| v.                               | * | Civil Case No. SAG-17-2898 |
|                                  | * |                           |
| **MATTHEW POW,** *et al.*        | * |                           |
|                                  | * |                           |
| **Defendants.**                  | * |                           |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**MEMORANDUM OPINION**

Plaintiff Verdessa McDougald ("Plaintiff"), individually and as personal representative of the estate of her deceased son, Tyree Woodson, filed an Amended Complaint against Michael Pow and Jeffrey Converse (collectively "Defendants"), detectives with the Baltimore Police Department ("BPD").[1] Plaintiff asserts wrongful death and survival claims arising out of Mr. Woodson's suicide, which occurred while he was in police custody on August 5, 2014. Discovery has now concluded, and Defendants have filed a Motion for Summary Judgment ("the Motion"). ECF 62. I have reviewed the Motion, along with Plaintiff's Opposition, and Defendants' Reply. ECF 63, 64. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, the Motion will be granted, and summary judgment will be entered in Defendants' favor.

---

[1] Plaintiff's claims against all other Defendants were dismissed by United States District Judge Ellen L. Hollander in an opinion dated March 15, 2019. ECF 42.

**I.     FACTUAL BACKGROUND**

The relevant facts, which are essentially uncontested, are viewed in the light most favorable to Plaintiff, the non-moving party.[2] On August 5, 2014, two BPD officers approached Plaintiff and her son, Mr. Woodson, as they departed their home. ECF 63-4 at 2–3. The officers detained Mr. Woodson "for an investigation," and placed him in the rear of a police vehicle, without handcuffs. *Id.* at 3. The officers did a cursory pat down, but did not search Mr. Woodson's medical boot for weapons before he was transported. *Id.*

Although the officers told Mr. Woodson they were detaining him for investigative purposes, they actually had a warrant for his arrest for the shooting and attempted murder of his cousin, Jerome Clifton McDougald ("McDougald"), on July 30, 2014. *Id.* at 1, 4. The police vehicle arrived at the Southwestern District Police Station at about 11:05 a.m. *Id.* at 3. Officers removed Mr. Woodson from the vehicle, and took him to the holding area, again without searching his person. *Id.* Another officer transported Mr. Woodson into a holding cell, and handcuffed him

---

[2] Somewhat inexplicably, the parties have submitted very little evidence appropriate for consideration at the summary judgment stage, instead attaching exhibits such as the Complaint, various police reports, and unsworn expert reports, which constitute hearsay at best. To "be entitled to consideration on summary judgment, the evidence supporting the facts set forth by the parties must be such as would be admissible in evidence." *Casey v. Geek Squad Subsidiary Best Buy Stores, L.P.*, 823 F. Supp. 2d 334, 349 (D. Md. 2011); *see also* Fed. R. Civ. P. 56(c)(2); *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993) ("The summary judgment inquiry thus scrutinizes the plaintiff's case to determine whether the plaintiff has proffered sufficient proof in the form of admissible evidence that could carry the burden of proof in his claim at trial."). However, both parties submitted, and rely on, the comprehensive incident report drafted by Detective Charles Anderson in support of their respective positions. ECF 62-2, ECF 63-4. While the incident report would not typically be admissible in evidence, reliance on an exhibit by both parties allows this Court to conclude that any hearsay objection has been waived. *See Motor Club of Am. Ins. Co. v. Hanifi*, 145 F.3d 170, 175 (4th Cir. 1998) (determining that hearsay objection had been waived when both parties submitted and relied upon a police report in connection with a summary judgment motion). Both parties also submit the deposition transcript from Mr. Woodson's girlfriend, Tahesha Juanita White, which this Court may properly consider. ECF 62-3; ECF 63-6. In essence, the parties do not dispute the relevant facts of this case, but adopt contrasting views about whether the facts suffice to demonstrate Defendants' liability for Mr. Woodson's suicide.

to a cement wall.  *Id.*  During his detention, a detective, who believed Mr. Woodson already had been searched, took Mr. Woodson, without handcuffs, to the bathroom, and allowed him to use the stall.  *Id.* at 4.

During Mr. Woodson's detention at the police station, a group of officers, including the Defendants, Detectives Pow and Converse, executed a search and seizure warrant at Mr. Woodson's home.  *Id.* at 4.  They recovered a loaded .40 caliber handgun from his bedroom, which they believed to be the weapon used to shoot McDougald.  *Id.*

Following the execution of the search warrant, Detectives Pow and Converse returned to the station and met with Mr. Woodson in an interview room.  *Id.*  Because Mr. Woodson was "very respectful," they removed the handcuff attaching him to the wall.  *Id.*  Detectives Pow and Converse also believed Mr. Woodson had been previously searched, and did not conduct another search of his person.  *Id.*  They Mirandized and began to interrogate Mr. Woodson by telling him about the handgun recovered from his bedroom, and advising him that they believed the handgun had been used to shoot McDougald.  *Id.*  The Detectives wanted Mr. Woodson to identify the person who had shot Mr. Woodson and his girlfriend on July 25, 2014.  *Id.*  The Detectives believed that McDougald committed that shooting, leading to the retaliatory shooting by Mr. Woodson days later.  *Id.*

As the interrogation proceeded, Detectives Pow and Converse described Mr. Woodson's demeanor as "worried," and he asked to smoke a cigarette.  *Id.*  Detectives Pow and Converse took him outside, behind the police station, to allow him to do so.  *Id.* at 4–5.  Mr. Woodson removed cigarettes and a lighter from his front pocket, although those items are generally contraband for an arrestee.  *Id.* at 5.  Because it was "only cigarettes," the detectives took no action to confiscate the items or to search Mr. Woodson for additional contraband.  *Id.*  While smoking, Mr. Woodson told

3

the detectives that he would identify the person who had shot him, but asked to call his girlfriend first. *Id.* The detectives' supervisor advised that Mr. Woodson should be allowed to make the call only after he identified the person who had shot him. *Id.*

Detectives Pow and Converse brought Mr. Woodson back to the holding area. *Id.* "Mr. Woodson expressed to them that he was very concerned about the safety and future of his family. He wanted his family relocated because he is a member of the Black Guerilla Family and they didn't trust him." *Id.* Mr. Woodson then positively identified McDougald as the person who had shot him and his girlfriend, and initialed a photograph. *Id.* Upon making the identification, Mr. Woodson became "demonstrative," and again requested to speak with his girlfriend. *Id.*

Detectives Pow and Converse allowed Mr. Woodson to call his girlfriend, Tahesha Juanita White. *Id.* During the call, Detectives Pow and Converse heard Mr. Woodson crying and telling her "that police found the gun and he was going to jail. He advised her that he would be gone for a long time, indicating he was going to jail, and he loved her." *Id.* Ms. White testified that Mr. Woodson was crying during the call, told her, "I'm going to call you when I get to Central Booking[]," and said, "I just want to let you know that if something happens to me, I want you to know that I love y'all." ECF 62-3 (White Depo.) at 9. Ms. White and Mr. Woodson had been together for six and a half years at the time of this incident. ECF 63-6 at 3. She testified that "at first when he was talking on the phone, it was just like a regular conversation, like any other time when he get locked up. . . . It didn't dawn on me to think that, oh, that would be the last time I would talk to him." *Id.* at 6. Ms. White stated that, from the phone call, the feeling that Mr. Woodson might hurt himself "never clicked in my mind." *Id.* at 10.

After hanging up the phone, Mr. Woodson "asked to use the bathroom to clear his head." ECF 63-4 at 5. Once again, Detective Pow escorted Mr. Woodson to the bathroom unhandcuffed,

4

and allowed him to close the door of the first stall while Detective Pow walked to the other end of the bathroom by the window. *Id.* The bathroom was unoccupied, other than Detective Pow and Mr. Woodson. *Id.* Moments later, Detective Pow heard a "pop," and when he opened the stall door, he saw Mr. Woodson slumped back against the side of the stall with blood running from his mouth. *Id.* Investigating officers recovered a Glock 23 from the bathroom stall, next to Mr. Woodson. *Id.* at 6. Mr. Woodson suffered a "single intraoral gunshot wound," and the Medical Examiner classified the cause of death as suicide. *Id.* at 8.

## II.     LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine dispute of material facts. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 131516 (4th Cir. 1993)). The mere existence of a "scintilla of evidence" in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

### III.   ANALYSIS

Plaintiff's Opposition extensively analyzes the deliberate indifference standard, which is used when plaintiffs have asserted that defendants' conduct violated a detainee's substantive due process rights. *See, e.g.*, ECF 63-1 at 10 ("[T]he Court has held that the government's deliberate indifference to the care of persons in its custody can shock the conscience for purposes of finding a substantive due process violation."); *id.* ("Liability under a deliberate indifference standard requires two showings . . . ."); *id.* at 11 ("Pow and Converse all illustrated a deliberate indifference to the welfare of Mr. Woodson."). However, in this case, Plaintiff has not asserted any constitutional claims. Instead, she brought claims for wrongful death and survival under Maryland law. ECF 22. Judge Hollander comprehensively summarized the governing legal standards in her March 15, 2019 opinion:

> Maryland's wrongful death statute is found in Md. Code (2013 Repl. Vol.), §§ 3-901 through 3-904 of the Courts & Judicial Proceedings Article. C.J. § 3-902,

> titled "Liability for death," [and] provides the wrongful death actions "may be maintained against a person whose wrongful act causes the death of another." C.J. § 3-902(a). "[A] wrongful death action is brought by the relatives of the decedent, seeking recovery for their loss as a result of the victim's death." *Jones v. Prince George's Cnty.*, 541 F.Supp.2d 761, 764 (D. Md. 2008) (citation omitted). Such an action "'is brought in the name of a person entitled to recover . . . .'" *Williams v. Work*, 192 Md. App. 438, 452, 995 A.2d 744, 753 (2010) (quoting *Walker v. Essex*, 318 Md. 516, 523, 569 A.2d 645, 648 (1990)), *aff'd sub nom. Ace Am. Ins. Co. v. Williams*, 418 Md. 400, 15 A.3d 761 (2011); *see Eagan v. Calhoun*, 347 Md. 72, 82, 698 A.2d 1097, 1102 (1997) (a wrongful death action "is brought by a spouse, parent, or child, or a secondary beneficiary who was wholly dependent on the decedent, to recover damages for his or her own loss accruing from the decedent's death"); *United States v. Streidel*, 329 Md. 533, 536, 620 A.2d 905, 907 (1993); C.J. § 3-904(d) ("damages awarded . . . are not limited or restricted by the 'pecuniary loss' or 'pecuniary benefit' rule but may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable for the death of . . . (1) A spouse . . . (3) A parent of a minor child . . . .").
>
> In contrast, the Survival Act permits the personal representative of the decedent to bring any claims that the decedent could have brought had he lived, and to recover for any funeral expenses caused by the conduct of the defendants. Md. Code (2011 Repl. Vol.), § 7-401(y)(1)(ii) of the Estate[s] and Trusts Article. In Case 1-Count I and Case 2-Count I, respectively, plaintiff asserts wrongful death and survival claims, both alleging that the intentional acts and gross negligence of the Officer Defendants resulted in Mr. Woodson's death.

ECF 42 at 37–38.

Because Mr. Woodson committed suicide, which is generally an independent superseding act precluding third-party liability for a death, Maryland law requires proof of one of two circumstances in order for Defendants to be found liable. The first requires proof that the

defendant's negligent conduct actually caused the suicide.[3] *Eisel v. Bd. of Educ. of Montgomery Cnty.*, 597 A.2d 447, 450 (Md. 1991). To prove actual causation, the negligence of the defendants must cause "the insanity of another and (1) the insanity prevents the person from understanding the nature of the act and the certainty of harm or (2) the insanity makes it impossible to resist an 'uncontrollable impulse' that deprives the person of the capacity to govern the person's own conduct in a reasonable manner." *Sindler v. Litman*, 887 A.2d 97, 109 (Md. Ct. Spec. App. 2005) (citing Restatement (Second) of Torts § 455 (Am. L. Inst. 1965)). Here, Plaintiff offers no expert testimony or other evidence which could permit a factfinder to conclude that Mr. Woodson was rendered insane by Defendants' actions. The uncontroverted evidence shows that Defendants engaged in a routine custodial interrogation of Mr. Woodson, a suspect in a shooting. Defendants and Mr. Woodson were respectful to one another during the interview. In fact, it is the accommodations Defendants made for Mr. Woodson's comfort (such as allowing him to smoke a cigarette and to use the restroom privately) that Plaintiff now contends constituted gross negligence. Clearly, the information Defendants conveyed to Mr. Woodson was not information that would be welcome to any recipient: the fact that a firearm had been recovered from his

---

[3] The parties extensively discuss the definition of "gross negligence" in their briefing, and whether Defendants' conduct met that standard. *See, e.g.*, 62-1 at 10-11; ECF 63-1 at 8-13. It is true that Plaintiff's Amended Complaint repeatedly, and unnecessarily, alleges that the officers' actions were "intentional and/or grossly negligent." *See, e.g.*, ECF 22 ¶ 3; *see also id.* ¶ 59 (alleging that defendants "engaged in intentional acts and/or grossly negligent conduct which resulted in serious injuries causing his [sic] death of Tyree Woodson"); *id.* at 15 (captioning "Case 1-Count 1" as "WRONGFUL DEATH FOR GROSS NEGLIGENCE"). Other paragraphs of the Amended Complaint refer simply to "negligence," which is the actual standard relevant to a wrongful death and/or survival action. *See, e.g.*, *id.* ¶ 68 ("As a result of the negligent, carelessness [sic], willful, intentional and/or malicious acts of the defendants . . . ."). Thus, this Court will decline to adopt the heightened evidentiary standard Plaintiff inexplicably attempted to impose on herself, and will not consider whether the conduct in question amounted to gross negligence. Instead, this Court will assume, without deciding, that Defendants' conduct was negligent, for purposes of the remaining analysis. Even under that lesser standard, summary judgment is warranted for the reasons described herein.

bedroom and associated with his cousin's shooting, the fact that he was being asked to cooperate with law enforcement by identifying the perpetrator in his own shooting, and the fact that he would be going to jail for a lengthy period of time. Mr. Woodson understandably became nervous and upset at his unfortunate circumstances. However, Plaintiff proffers no evidence that might support a conclusion that his mental state progressed beyond one of "nervous and upset" to one of "insane." In fact, the evidence suggests a distinct degree of rationality—Mr. Woodson asked to speak with his girlfriend, engaged in a conversation that did not cause her any concern that he might harm himself, and then asked to use the restroom to clear his head, undermining any suggestion that he was unable to govern his conduct in a reasonable manner as a result of Defendants' actions.

Where, as here, there is no evidence that defendants' actions actually caused the decedent's suicide by rendering the decedent insane, a plaintiff must show "that a special relationship between a defendant and the suicidal person creates a duty to prevent a foreseeable suicide." *Eisel*, 591 A.2d at 450. As Judge Hollander noted, "Maryland law is not clear whether custody alone creates a special relationship." *See* ECF 42 at 45 ("[A]bsent continuing custody or control of an inebriate, a police officer has no special relationship that creates any duty requiring the officer to protect the person from the consequences of his or her own acts." (quoting *Holson v. State*, 637 A.2d 871, 879 (Md. Ct. Spec. App. 1994)). This Court need not reach that question, however, because even assuming that a special relationship arose from the fact that Mr. Woodson was in custody, triggering a duty on the part of the officers to prevent a foreseeable suicide, Plaintiff has not adduced any evidence that Mr. Woodson's suicide was foreseeable.

Leading up to his suicide, Mr. Woodson had not made any statements indicating suicidal intent, had not displayed indicia of depression or humiliation (though he understandably had become distressed at his immediate situation), had not made reference to or demonstrated any signs

9

of prior suicide attempts, and had not engaged in any activity that would lead the Defendants to suspect a potential for danger.  In fact, Mr. Woodson had already used a bathroom stall once, during the course of his detention, without incident.  Moreover, the Defendants had not received any information from family, friends, or other sources, or any information regarding previous arrests of Mr. Woodson, that would lead them to believe he might become suicidal.  Defendants' observations that Mr. Woodson was worried and nervous, was concerned about the safety of his family because he was a member of the Black Guerilla Family, and had told his girlfriend that he was going to jail for a long time, do not suggest a suicide risk.  In fact, his express statements that he would be incarcerated for a long time and that he would call his girlfriend when he arrived at Central Booking reflect exactly the opposite: a person with future plans and no present suicidal intent.  The fact that Ms. White, who had known Mr. Woodson well for more than six years, did not have concern after the conversation that he might harm himself, suggests that the arresting officers, listening to the conversation, would have no basis to suspect that his suicide was imminent.

Plaintiff's repeated citations to *Hanlin-Cooney v. Frederick Cnty.*, Civil No. WDQ-13-1731, 2014 WL 576373 (D. Md. Feb. 11, 2014), simply highlight the comparative lack of foreseeability in this case.  In *Hanlin-Cooney*, the decedent detainee had been placed on "0523 checks," which are frequent checks performed when detainees are at recognized risk for suicide or self-harm.  *Id.* at *2.  The officers knew that the decedent had been crying out for help and threatening to commit suicide, but failed to complete the required checks of his well-being.  *Id.* at *3.  Plaintiff offers no comparable evidence of foreseeability here.  Mr. Woodson was not at recognized risk for suicide, made no express references to suicide, and in fact made statements to

10

his girlfriend expressly describing his future plans, indicating a lack of present intent to commit suicide.

Finally, Plaintiff cites the testimony of her expert witness, Neil Franklin, who was hired to opine "regarding police misconduct, patterns, and practices." ECF 63-5. While the Fourth Circuit has not expressly decided the issue, unsworn expert reports are often excluded from consideration when resolving a summary judgment motion. *See, e.g.*, *In re Eternity Shipping, Lts., Eurocarriers, S.A.*, 444 F. Supp. 2d 347, 363 (D. Md. 2006) ("Hislop's report is unsworn and, therefore, inadmissible in a summary judgment proceeding."); *Turner v. Hum. Genome Sci., Inc.*, 292 F. Supp. 2d 738, 743 (D. Md. 2003) ("[U]nsworn statements or expert reports do not qualify as affidavits and are not proper for consideration by the court when ruling on a motion for summary judgment."); *Solis v. Prince George's Cnty.*, 153 F. Supp. 2d 793, 799 (D. Md. 2001) (declining to consider unsworn expert reports on summary judgment). Even if Franklin's report were considered, his conclusion that the actions or inactions of Defendants and the other officers "rise to the level of gross negligence," ECF 63-5 ¶ 64, would not be permitted. An expert witness cannot opine as to whether a legal standard has been met. *United States v. McIver*, 470 F.3d 550, 562 (4th Cir. 2006) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible."). Finally, Franklin's testimony about the adequacy of Defendants' compliance with police regulations and procedures fails to address the primary deficiency in Plaintiff's case. Without expert testimony, or any other evidence, suggesting that Mr. Woodson's conduct rendered his suicide foreseeable to the custodial officers, summary judgment in Defendants' favor is warranted.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment, ECF 62, will be GRANTED. A separate Order follows.

Dated: November 3, 2020

/s/
Stephanie A. Gallagher
United States District Judge